

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
02/21/2020

| | | |
|---|---|---|
| IN RE: | § | |
| **HOUSTON BLUEBONNET, L.L.C.** | § | **CASE NO: 16-34850** |
| Debtor(s) | § | |
| | § | **CHAPTER  11** |
| | § | |
| **HENRY R. HAMMAN,** *et al* | § | |
| Plaintiffs | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 16-03251** |
| | § | |
| **KENNETH R. LYLE,** *et al* | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

Henry R. Hamman, *et al.*[1] filed suit in state court against Kenneth Lyle *et al.*[2] claiming to have succeeded to an oil and gas interest in a 20-acre leasehold and seeking to be paid net profits or proceeds pursuant to that interest.  Houston Bluebonnet, LLC filed a notice of removal of the state court proceeding to this Court.

Lyle filed a motion for summary judgment, arguing that the Hammans' predecessors previously assigned all of their rights and interests in the 20 acres to Humble Oil & Refining Company ("Humble") pursuant to a 1920 Agreement.  If that were correct, it would leave the Hammans with no interest or claims related to the leasehold.  The Hammans, through a cross-motion for partial summary judgment, countered that the 1920 Agreement did not modify the obligations of Humble and its successor working interest owners to account for and pay the Hammans the net proceeds or profits from production on the 20 acres.

---

[1] The plaintiffs consist of Henry R. Hamman, The George and Mary Josephine Hamman Foundation, Laura Hamman Fain, and Elizabeth Hamman Oliver (the "Hammans").  (*See* ECF No. 70).

[2] The defendants consist of Jennie Kay Lyle Bierscheid, executrix of the estate of Kenneth R. Lyle, deceased ("Kenneth R. Lyle"), Lyle Engineering Company, Houston Bluebonnet, LLC, E&H, LP ("E&H"), American Universal Investment, Co. ("American Universal"), and Esther Suckle, Trustee of the Suckle 1999 Living Trust ("Suckle").  (*See* ECF No. 68).

On August 15, 2017, the Court held that the 1920 Agreement preserved the Hammans'
interest in the 20 acres despite the conveyance to Humble.  The Court further held that the Texas
Supreme Court's decision in *Sheffield v. Hogg* did not operate to bar the Hammans' claims under
res judicata principles.

On August 29, 2017, Lyle filed a motion for reconsideration, which this Court denied.
Thereafter, Lyle sought an appeal of this Court's decision in the District Court, which affirmed
this Court's decision.  Lyle appealed the District Court's order to the United States Court of
Appeals for the Fifth Circuit on June 13, 2018.  The Fifth Circuit held that this Court's partial
summary judgment did not constitute a final judgment which could be appealed.  The Fifth
Circuit vacated the District Court's decision.  On March 7, 2019, pursuant to the Fifth Circuit's
opinion and mandate, the District Court dismissed Lyle's appeal.  That same month, Lyle filed a
second notice of appeal, seeking leave to appeal the Court's interlocutory order.  The District
Court denied Lyle's motion for leave and dismissed the second notice of appeal without
prejudice.

During the pendency of the interlocutory appeal, the Hammans filed a motion for
summary judgment as to liability and damages—the motion now at issue before the Court.  The
Hammans seek: (i) four years' worth of damages for net profits owed under the 1913
Assignment, as modified by the 1920 Agreement; (ii) a declaration of specific performance with
respect to net profits accruing from January 1, 2018 forward; and (iii) attorney's fees and pre-
judgment interest on the unpaid net profits interest.  Lyle filed a cross-motion for summary
judgment arguing that: (i) the Hammans' claims are barred by the four-year statute of limitations,
waiver, and accord and satisfaction; (ii) none of the Lyle Defendants agreed to pay or assumed

Humble's debts arising out of either the 1913 Assignment or the 1920 Agreement; and (iii) the Hammans' alleged rights are precluded by *Sheffield v. Hogg*.

For the reasons set forth below, the Court grants summary judgment in part and denies summary judgment in part.

## Background[3]

On June 6, 1913, Ima Hogg[4] *et al.*[5] executed an oil and gas lease to John Hamman (the "Hogg Lease").  (*See* ECF No. 19-2).  The Hogg lease covered approximately 700 acres of land

---

[3] A substantial portion of this background section was written in reliance on the parties' briefing.  It is included solely for background and does not constitute findings of fact by the Court.

[4] Ima Hogg, who lived from July 10, 1882 to August 19, 1975, known as "the First Lady of Texas" was a "civic leader, art collector, musician, and philanthropist."  *Texas's Ima Hogg Philanthropist*, N.Y. TIMES, Aug. 21, 1975, https://timesmachine.nytimes.com/timesmachine/1975/08/21/79713823.pdf; Jamie Ross, *Hogg, Ima*, LEARNING TO GIVE, https://www.learningtogive.org/resources/hogg-ima. "Her interests and passions included music, art, antiques, minority issues, mental health, education, and historical preservation."  Jamie Ross, *Hogg, Ima*, LEARNING TO GIVE, https://www.learningtogive.org/resources/hogg-ima.  The passion and dedication with which she approached these diverse interests "made her one of the most respected and admired women in Texas history."  *Id.*  Miss Ima, as she was affectionately known for most of her life, "gave up her early plans to be a concert pianist.  She founded the Houston Symphony Orchestra, gave many[] scholarships in the fine arts, and donated historical lands and dwellings to the public."  *Texas's Ima Hogg Philanthropist*, N.Y. TIMES, Aug. 21, 1975, https://timesmachine. nytimes.com/timesmachine/1975/08/21/79713823.pdf.  Miss Ima was an avid art collector, "she discovered a passion for the work of Picasso, Klee, and Matisee, as well as other greats of modern art."  *Lone Star*, THE MAGAZINE ANTIQUES (Mar. 3, 2017), https://www.themagazineantiques.com/article/lone-star/.  It was Miss Ima Hogg's cultural interests which in part "caused her to become legendary in Texas during her lifetime."  Kammen, Michael, *Miss Ima's Legacy of Americana*, N.Y. TIMES, Mar. 4, 1984, https://www.nytimes.com/ 1984/03/04/travel/miss-ima-s-legacy-of-americana.html.  One of Miss Ima's gifts and legacies was the Bayou Bend, a pink marble colonial home on Buffalo Bayou built in 1928, in which she lived in Houston.  *Texas's Ima Hogg Philanthropist*, N.Y. TIMES, Aug. 21, 1975, https://timesmachine.nytimes.com/timesmachine/1975/08/21/79713823. pdf.  "Each room was appointed with authentic early American furniture and significant art."  In 1968, the Bayou Bend, its art and antiques, along with the 15-acre surrounding grounds and gardens, became a part of her donation to the Museum of Fine Arts as a decorative wing. *The First Lady of Texas: Ima Hogg*, HOUSTON PUBLIC MEDIA (Feb. 6, 2016).  Miss Ima's cultural gifts also included the restoration of the Hogg family home at Varner Plantation, which she presented to the State of Texas and which became known as the Varner-Hogg Plantation State Historical Site.   Virginia Bernhard, *Hogg, Ima*, TEX. STATE HISTORICAL ASSOC., https://tshaonline.org/handbook/ online/articles/fho16.  Miss Ima Hogg's reach included her appointment "by both President Eisenhower and President Kennedy to advisory committees concerning the arts."  Jamie Ross, *Hogg, Ima*, LEARNING TO GIVE, https://www.learningtogive.org/resources/hogg-ima.  During her impressive lifetime, Miss Ima received many awards including the "Santa Rita Award, given by the University of Texas," and the "Thomas Jefferson Award for outstanding contributions to America's cultural heritage."  Virginia Bernhard, *Hogg, Ima*, TEX. STATE HISTORICAL ASSOC., https://tshaonline.org/handbook/online/articles/fho16.  Additionally, in 1971, "Southwestern University gave Miss Hogg an honorary doctorate in fine arts."  *Id.*

[5] Ima Hogg, Mike Hogg, Will C. Hogg, and Tom Hogg.  (ECF No. 19-2 at 5).

in Brazoria County, Texas, and reserved a 1/8 royalty interest in the Hoggs.  (ECF No. 19-2 at 1–2).

On October 17, 1913, John Hamman and George Hamman, *et al.* assigned the Hogg Lease and other leases to Producers Oil Company ("Producers").  (ECF No. 19-3).  As part of the 1913 Assignment, George Hamman, J.C. McKallip, and F.N. Bullock received a 1/8 net proceeds interest in the sale of oil, gas, or other minerals produced from the underlying leaseholds.  (ECF No. 19-3 at 6).  The 1913 Assignment provided that in the event that "the second party should discover and produce oil, gas, or other minerals," George Hamman and J.C. McKallip were to receive 5/6 of the 1/8 net proceeds interest while F.N. Bullock was to receive the remaining 1/6 after first deducting all royalties due to the original lessors, the Hoggs, or others under the leases, "as well as all expenses related to the ownership, operation, and marketing of oil, gas, and other minerals produced under the leases."  (ECF Nos. 18 at 5; 19-3 at 6–7).

Through a series of assignments in April 1914, George Hamman, John Hamman, W.T. McKallip, J.C. McKallip, and F.N. Bullock's interest equalized to 1/5 of the 1/8 net proceeds each.  (ECF No. 19 at 5–6).[6]  Immediately prior to the 1920 Agreement described below, George Hamman, John Hamman, and F.N. Bullock owned 1/5 in the 1/8 net profits, while Clarion Oil Company owned the remaining 2/5 of the 1/8 net profits interest under the 1913 Assignment.  (ECF Nos. 19 at 8; 19-1 at 1).  The Hammans' net profits interest claim derives from George and John Hamman's portion, which amounts to 2/5 of the 1/8 net profits, or a 5.00% net profits interest.

---

[6] "Whereas by instrument dated April 3, 1914, George Hamman, John Hamman, J.C. McKallip, W.T. McKallip and F.N. Bullock entered into an agreement and final adjustment whereby it was agreed that each of said parties should thereafter own an undivided 1/5 of the reserved 1/8 royalty interest under said instrument of assignment in this lease, as well as in other interests held by them or any one of them in oil leases or contracts in said agreement of April 3, 1914, referred to . . . ."  (ECF No. 19-6 at 1).

On May 2, 1917, Producers conveyed the Hogg Lease to F.N. Bullock.  (*See* ECF No. 19-6 at 1 (noting Producers "has transferred, assigned, set over and sub-leased . . . all of its right, title privileges, interests and claim under the said lease from Miss Ima Hogg, Mike Hogg, Will C. Hogg, and Tom Hogg to John Hamman")).  The assignment included Lots 17, 18, 19, and 20—the property at issue—and provided that F.N. Bullock agreed to:

> [A]ssume and carry out all liabilities and obligations of the sub-lessor under the aforesaid original lease, extension thereof and transfer to Producers Oil Company . . . including payment of royalties to the original lessors *and the advance royalties reserved unto George Hamman, J.C., and W.T. McKallip, John Hamman and F.N. Bullock* (who is sub-lessee herein) in said transfer to Producers Oil Company, dated October 17, 1913 . . . .

(ECF No. 19-6 at 1–2) (emphasis added).

On May 23, 1917, F.N. Bullock assigned the Hogg Lease to Tyndall-Wyoming Oil & Development Company ("Tyndall-Wyoming").  (*See* ECF No. 19-7).  Similar to the conveyance from Producers to F.N. Bullock, the deed made the conveyance subject to the Hoggs' 1/8 royalty interest and the 1913 Assignment, and further bound Tyndall-Wyoming's successors-in-interest to the covenants set forth in both assignments:

> [Tyndall-Wyoming] agrees to comply with each and every duty and obligation of said F.N. Bullock in respect to the lands included herein, both under said Mineral Lease Contract so executed by said Miss Ima Hogg, and others to said John Hamman, [the Hogg Lease] as well as under the transfer thereof by said John Hamman, and others to said Producers Oil Company, [the 1913 Assignment] and the subsequent transfer thereof by said Producers Oil Company to said F.N. Bullock*, including the compliance with the obligation of said Producers Oil Company to George Hamman, John Hamman, W.T. McKallip, J.C. McKallip and F.N. Bullock*, as shown by said transfer of said lease from said John Hamman, and others, to said Producers Oil Company, under date of October 17, 1913, *to pay to them, said John Hamman, and others, certain royalty or compensation*.  Said obligation on the part of said Producers Oil Company was assumed by said F.N. Bullock under said Transfer of said Lease of date May 2, 1917, and the same is now, in turn, assumed by said Tyndall-Wyoming Oil Development Company, *who shall be as fully bound*, in the premises, to said George Hamman, John Hamman, W.T. McKallip, J.C. McKallip, and F.N. Bullock as said Producers Oil Company became by said transfer of said lease so dated October 17, 1913.

TO HAVE AND TO HOLD the same, unto said Tyndall-Wyoming Oil & Development Company, *its successors and assigns, forever* . . . .

(ECF No. 19-7 at 2) (emphasis added).

On April 4, 1918, Tyndall-Wyoming conveyed the Hogg Lease to Sutherland Oil Company ("Sutherland"). (ECF No. 19-8 at 1–5). Just as the assignments before it, the conveyance to Sutherland covered Lots 17, 18, 19, and 20, and made the conveyance subject to the covenants in the Hogg Lease and the 1913 Assignment, further binding Sutherland "its successors or assigns" to comply with the obligations previously undertaken by Tyndall.[7] (ECF No. 19-8 at 2–3). Thereafter, on April 24, 1918, Sutherland conveyed the Hogg Lease to Dan A. Japhet. (ECF No. 19-9 at 1–2). Similarly, the conveyance was made subject to the Hogg Lease and the previous April 4, 1918 assignment from Tyndall-Wyoming to Sutherland, "together with all personal property in said assignment and conveyance fully described . . . ." (ECF No. 19-8 at 1–2).

On February 20, 1919, a portion of the Hogg Lease was assigned to Humble Oil & Refining Company ("Humble") by Dan Japhet, *et al.*[8] (the "Hogg-Japhet Lease"). (ECF Nos. 18 at 5–6; 19 at 4; *see* 19-10). The assignment included 20 acres located in the West Columbia Oil Field—these 20 acres represent the leasehold at issue in this adversary proceeding (the "1919 Assignment"). (ECF Nos. 18 at 6; 19 at 4). The Hogg-Japhet Lease[9] provided an account of the passage of title to the property in question from its original owners, Ima Hogg, Mike Hogg, Will

---

[7] As the documents before it, the assignments referred to the Hogg Lease as the "Mineral Lease Contract" or "original contract," and referred to the 1913 Assignment as the October 17, 1913 transfer between Producers and Hamman, *et al*. (ECF No. 19-8 at 1–2).

[8] Dan A. Japhet, R.S. Coon, J.A. Williams, and T.W. Wilson. (ECF No. 19-11 at 1).

[9] The parties also use the term the "1919 Assignment" to refer to the Hogg-Japhet Lease. In various filings, the terms are used interchangeably. Both terms refer to the conveyance from Dan Japhet to Humble on February 20, 1919.

C. Hogg, and Tom Hogg, to Dan A. Japhet with the Hoggs' reservation of a 1/8 royalty interest and "the net 1/8 money working interest reserved originally in the transfer from George Hamman[,] *et al.* to the Producers Oil Company of date October 17, 1913."  (ECF No. 19-10 at 2–4).

On June 22, 1920, George Hamman, John Hamman, F.N. Bullock, and Clarion Oil Company, owners of the 1/8 net proceeds interest in the 20 acres, entered into a settlement agreement and assignment with Humble, owner of the 7/8 working interest on that date.  (ECF Nos. 19-1; 19 at 4).  The 1920 agreement and assignment (the "1920 Agreement") accomplished the following:

    i.  Paragraph 1 ratified all accounts kept by Humble and recognized a restricted credit to the net proceeds owners of $182,451.72[10] on account of oil and gas production on and prior to April 12, 1920.  (ECF No. 19-1 at 2).

    ii.  Paragraph 2 provided that the 7/8 working interest in the underlying acreage would become Humble's property, subject to the net proceeds owners' option under Paragraph 3 to convert their 1/8 net proceeds interest into a 1/8 working interest in kind.  (ECF No. 19-2 at 3–4).  It further provided that if the net proceeds owners chose to convert their net proceeds interest into a working interest, the net proceeds owners would be required to pay their share of working interest expenses.  (ECF No. 19-1 at 3–4).

    iii.  Paragraph 4 allowed the net proceeds owners to convert their 1/8 working interest back to a profit-sharing interest if they previously converted their original 1/8 net proceeds interest into a working interest pursuant to paragraph 3.  (ECF No. 19-1 at 4).  The net proceeds owners were allowed to exercise their options to convert their net proceeds interests as often as they desired.  (ECF No. 19-1 at 5).

    iv.  Paragraph 7 stated that, in order not to modify or change the rights or obligations of Humble with relation to third parties, the net proceeds owners agreed to "transfer and assign to [Humble] all of their rights which they hold with respect to the leased premises . . . *save where such grant might conflict*" *with the net proceeds owners' rights*.  (ECF No. 19-1 at 5) (emphasis added).

---

[10] $182,451.72 in 1920 is worth over $2,300,000.00 100 years later in 2020.  The parties were settling a material dispute.  Humble Oil had only been incorporated for 3 years in 1920.  James A. Clark & Mark Odintz, *Exxon Company, U.S.A.,* TEX. STATE HISTORICAL ASSOC., https://tshaonline.org/handbook/online/articles/doe04.  Its initial capitalization was a scant $1,000,000.00.  *Id.*  This dispute concerned 18.00% of Humble Oil's initial capitalization.

v.  Paragraph 8 provided that, except as changed within the agreement, the duties and rights of the net proceeds owners and Humble as existed prior to the agreement remain unchanged.  (ECF No. 19-1 at 6).

Through numerous conveyances, Lyle, *et al*. acquired a portion of Humble's interest in the 20 acres.  (ECF No. 18 at 9).

### Procedural History

Henry R. Hamman and The George and Mary Josephine Hamman Foundation filed suit on November 25, 2013, in the 149th District Court of Brazoria County, Texas, against Kenneth Lyle and thirteen other defendants.  (ECF No. 18 at 3).  The Hammans claimed to have succeeded to a portion of the net proceeds interest reserved by George Hamman, J.C. McKallip, and F.N. Bullock in the 1913 Assignment to Producers, and claimed to be successors of George and John Hamman.  (ECF No. 18 at 3).  Consequently, the Hammans allege that they are entitled to net profits or proceeds from oil production on the 20 acres, which are the subject of the Hogg-Japhet Lease and the 1920 Agreement.  (ECF No. 19 at 2).  Laura Hamman Fain and Elizabeth Hamman Oliver joined the Hammans as plaintiffs and successors of George Hamman in January 2016.  (ECF No. 18 at 3).

On September 20, 2016, Houston Bluebonnet, a defendant in the Hammans' state court lawsuit, filed chapter 11 bankruptcy.  (Case No. 16-34850; ECF No. 1).  Houston Bluebonnet subsequently filed a notice of removal of the Hammans' state court lawsuit on November 9, 2016, which initiated this adversary proceeding.  (*See* ECF No. 1).

Lyle filed a motion for summary judgment on July 10, 2017.  (*See* ECF No. 18).  In his motion, Lyle argued that the Hammans held no interest in the current oil production on the 20 acres given that their predecessors assigned all interest in that acreage to Humble pursuant to paragraph 7 of the 1920 Agreement.  (ECF No. 18 at 2).  This position, in Lyle's view, was

confirmed by the Texas Supreme Court's opinion in *Sheffield v. Hogg*, 77 S.W.2d 1021 (1934). (ECF No. 18 at 8).

Also on July 10, 2017, the Hammans filed a cross-motion for partial summary judgment. (*See* ECF No. 19).  The Hammans countered that the clear language of the 1920 Agreement did not modify the obligations of Humble and its successors to account for and pay the Hammans' net proceeds or profits interest from operation on the 20 acres.  (ECF No. 19 at 2).

On August 15, 2017, this Court granted the Hammans' motion for partial summary judgment and denied Lyle's cross-motion for summary judgment.  (*See* ECF No. 27).  The Court held that the 1920 Agreement preserved the Hammans' interest in the 20 acres despite the conveyance to Humble.  (ECF No. 27 at 9).  The Court noted that the 1920 Agreement, through a savings clause in paragraph 7, specifically reserved the Hammans' 1/8 net proceeds interest. (ECF No. 27 at 9).  The Court further held that the Texas Supreme Court's decision in *Sheffield v. Hogg* did not prevent the Hammans from maintaining an interest in the 20 acres, because: (i) *Sheffield* only recognized and dealt with the interest constituting the Hogg Lease; (ii) the Hammans' interest is carved out of the oil defendants'[11] 7/8 interest—specifically, the Hammans' interest is carved from the 20 acres; and (iii) the Hammans were not a party in *Sheffield* or in privity with any party within that case, precluding a res judicata finding.  (ECF No. 27 at 11).

On August 29, 2017, Lyle filed a motion for reconsideration, which the Court denied. (*See* ECF Nos. 31, 32).  Lyle appealed this Court's decision to the District Court, which affirmed the Court's Opinion.  (*See* ECF No. 46).  On June 13, 2018, Lyle appealed the District Court's order to the United States Court of Appeals for the Fifth Circuit.  (ECF No. 56 at 2).  The Fifth

---

[11] Five private oil corporations engaged in the production of oil under the Hogg Lease, including Humble—all of which were made defendants in *Sheffield v. Hogg*.  (ECF No. 27 at 9).

Circuit found that "[t]he bankruptcy court's grant of a partial summary judgment in favor of the Hammans did not result in a final judgment" and therefore vacated the district court's ruling. *Matter of Houston Bluebonnet, L.L.C*, 752 Fed. App'x 191, 193 (5th Cir. 2019).  On March 7, 2019, pursuant to the Fifth Circuit's opinion and mandate, the District Court dismissed Lyle's appeal.  (*See* ECF No. 52).  Lyle thereafter filed a second notice of appeal, seeking leave to appeal the Court's interlocutory order.  (*See* ECF No. 54).  The District Court denied Lyle's motion for leave to appeal the Court's interlocutory order and dismissed its second notice of appeal without prejudice.  (ECF No. 62 at 2).

While Lyle's interlocutory appeal was pending, the Hammans filed a motion for partial summary judgment as to liability and damages—the motion currently at issue before the Court. (*See* ECF No. 48).  Through their motion, the Hammans seek: (i) a finding of liability for the alleged net profits interest under the 1913 Assignment and the 1920 Agreement; (ii) damages in the amount of net profits due from four years prior to the filing of the suit through December 31, 2017; (iii) specific performance of the accounting and payment obligations with respect to the net profits accruing from January 1, 2018 forward; and (iv) recovery of attorney's fees and pre-judgment interest.  (ECF No. 48 at 3).

Lyle filed a cross-motion for summary judgment.  (*See* ECF No. 68).  In his motion, Lyle claims that: (i) the Hammans' claims are barred by the four-year statute of limitations; (ii) none of the Lyle Defendants agreed to pay or assumed Humble's debts arising from the 1913 Assignment or the 1920 Agreement; (iii) the Hammans have waived their net profits interest under the agreements; (iv) settlement, accord, and satisfaction preclude a finding in favor of the Hammans; and (v) the Hammans alleged rights were determined by *Sheffield v. Hogg*, which found no title or interest in the Hammans.  (ECF No. 68 at 3–13).

**Jurisdiction**

The District Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), and (O). Pursuant to 28 U.S.C. § 157(a), this proceeding has been referred to the Bankruptcy Court by General Order 2012-6.

**Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Fed. R. Bank. P. 7056 incorporates Fed. R. Civ. P. 56 in adversary proceedings. A party seeking summary judgment must demonstrate the absence of a genuine dispute of material fact by establishing the absence of evidence supporting an essential element of the non-movant's case. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009). A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In cases involving the interpretation of a contract, summary judgment is only appropriate where the language of the contract is unambiguous. *See Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996); *Cooper Indus., LLC v. Precision Castparts Corp.*, 2016 WL 4939565, at *6 (S.D. Tex. Sept. 14, 2016).

A court views the facts and evidence in the light most favorable to the non-moving party at all times. *Plumhoff v. Rickard,* 572 U.S. 765, 768 (2014). Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence. *Keen v. Miller Envtl. Grp.*,

*Inc.*, 702 F.3d 239, 249 (5th Cir. 2012).   "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 1715 (2016).

A party asserting that a fact cannot be or is genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact.  Fed. R. Civ. P. 56(c)(1).  The Court need consider only the cited materials, but it may consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).  The Court should not weigh the evidence.  *Wheat v. Fla Par. Juvenile Justice Comm'n*, 811 F.3d 702, 713 (5th Cir. 2016).  A credibility determination may not be part of the summary judgment analysis.  *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).  However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.  Fed. R. Civ. P. 56(c)(2).  Moreover, the Court is not bound to search the record for the non-moving party's evidence of material issues.  *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).

"The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact."  *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015).  The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence entitling the movant to judgment at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 322–24. The non-moving party must cite to specific evidence demonstrating a genuine dispute. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The non-moving party must also "articulate the manner in which that evidence supports that party's claim." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). Even if the movant meets its initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact.

## Analysis

### I.      Liability

The Hammans argue that they are entitled to 5.00% of the net profits interest in the Hogg-Japhet Lease in accordance with the 1913 Assignment, as amended by the 1920 Agreement. (ECF No. 48 at 6). Specifically, the Hammans argue that the covenants created under both the 1913 Assignment and the 1920 Agreement run with the ownership of the working interest in the Hogg-Japhet Lease. (ECF No. 48 at 7).

Lyle counters that: (i) none of the assignments after a 1969 assignment from Humble to Salmon were subject to the 1913 Assignment (which created the Hammans' net working interests); (ii) the Hammans' claims are barred by the four-year statute of limitations, laches, and collateral estoppel; (iii) the 1920 Agreement altered the rights and obligations of the parties and therefore operated as an accord and satisfaction of any disputes between Humble and the Hammans; and (iv) the Hammans' claims are foreclosed by the Texas Supreme Court's ruling in *Sheffield v. Hogg*. (*See* ECF No. 50).

### A. *Sheffield v. Hogg*

This Court previously held that 1920 Agreement preserved the Hammans' 1/8 net proceeds interest in the 20 acres despite the conveyance to Humble. (ECF No. 27 at 9). In its previous Memorandum Opinion, this Court found that the Texas Supreme Court's decision in *Sheffield v. Hogg* did not prevent the Hammans from maintaining an interest in the 20 acres pursuant to the Hogg-Japhet Lease, because: (i) *Sheffield* only recognized and dealt with the interest constituting the Hogg Lease; (ii) the Hammans' interest is carved out of the oil defendants' 7/8 interest—specifically, the Hammans' interest is carved from the 20 acres in the Hogg-Japhet Lease; and (iii) the Hammans were not a party in *Sheffield* or in privity with any party within that case, precluding a res judicata finding. (ECF No. 27 at 11). Thus, the 1920 Agreement did not alter any obligations between the Hammans and Humble, nor are the Hammans' claims foreclosed by the ruling in *Sheffield v. Hogg*. Lyle may not relitigate previously adjudicated claims and defenses through another summary judgment motion.

### B. *The Hammans' Net Proceeds Interest*

Lyle does not dispute that it is a successor-in-interest to a portion of Humble's working interest in the Hogg-Japhet Lease. Rather, Lyle contends that it is not bound by the 1913 Assignment between George Hamman, *et al*. and Producers, which created the Hammans' net profits interest, or the 1920 Agreement that amended the net profits interest, and is therefore not responsible for any of the alleged damages claimed by the Hammans. Specifically, Lyle argues that ownership of its working interest "does not establish any obligation to pay" because none "of the assignments out of Humble to Salmon and any subsequent working interest owner were subject to the 1913 Assignment." (ECF No. 50 at 3). Furthermore, although "some [of the subsequent assignments] were subject to" the 1920 Agreement "no actual notice was provided."

(ECF No. 50 at 3–4 (claiming it was without notice because "**NONE** of the instruments in the subsequent assignment of the chain of title make reference to the 1913 Assignment, at all"; therefore "[a]ny rights remaining for any payment under the 1920 Settlement Agreement and Assignment were debt obligations of Humble that were neither agreed to nor assumed by the subsequent Assignees of the working interest")).   Thus, Lyle argues that it is not bound by the terms in either agreement, because subsequent conveyances did not intend to bind Humble's successors-in-interest to the agreements, and even if they did, none provided adequate notice sufficient to make Lyle responsible for any of the Hammans' alleged unpaid royalties.

*Relevant Conveyances*

In October 1913, John Hamman and George Hamman, *et al.* assigned the Hogg Lease to Producers.   (*See* ECF No. 19-3).[12]   Through the 1913 Assignment, George Hamman, *et al.* reserved a 1/8 net proceeds interest "from the sale of the products so produced" from the Hogg Lease.[13]   (ECF No. 19-3 at 6).   The conveyance made Producers and its "successors and assigns . . . subject to conditions" set out in the 1913 Assignment.  (ECF No. 19-3 at 6).

In February 1919, Dan Japhet, *et al.*—as the current owner of the Hogg Lease at the time—assigned a portion of the Hogg Lease to Humble.   (*See* ECF No. 19-10).   The Hogg-Japhet Lease, as this assignment is known, provided an account of the passage of title of the Hogg Lease from its inception to present, and specifically highlighted the portion conveyed to Humble, which are Lots 17, 18, 19, and 20 of the Hogg Lease.[14]   (ECF No. 19-10 at 1–3). Importantly, the account of the passage of title within the Hogg-Japhet Lease, included the 1913

---

[12] The Hogg Lease was previously conveyed from Ima Hogg, *et al.* to John Hamman and covered approximately 700 acres of land in Brazoria County, Texas.  Through the Hogg Lease, Ima Hogg, *et al.* reserved a 1/8 royalty in the land covering the lease.  (ECF No. 19-2 at 1–2).

[13] The 1913 Assignment reserves the 1/8 net proceeds interest from the "lands covered by the leases assigned herein," which derive from the Hogg Lease's 700 acres.  (*See* ECF Nos. 19-2, 19-3).

[14] These lots make up 20 acres of land, which derive and are carved out of the Hogg Lease.

Assignment, and further stated that in consideration of $200,000.00, Dan Japhet, *et al.* conveyed to:

> Humble Oil & Refining Company all of their rights, title and interest under said original contract, as extended, in *so far as the same affects said Lots 17, 18, 19, and 20 of the J.S. Hogg 160-acre subdivision* out of the Martin Varner and J.H. Bell leagues of land, situated in Brazoria County, Texas, subject to the royalty interests reserved under said contract *and transfers hereinbefore referred to*, and to the royalties herein reserved to assigns, and *subject also to any and all of the conditions and agreements* to be performed by said Humble Oil & Refining Company . . .
>
> TO HAVE AND TO HOLD unto the said Humble Oil & Refining Company, its [su]ccessors and assigns, forever.

(ECF No. 19-10 at 3) (emphasis added).  The Hogg-Japhet Lease further made the provisions and contents in the lease binding on any of Dan Japhet's and Humble's successors and assigns through the following language:

> It is further agreed that all the conditions and terms hereof shall extend to the heirs, executors, legal representatives, successors and assigns of the parties hereto.

(ECF No. 19-10 at 5).  Thus, the Hogg-Japhet Lease incorporated the 1913 Assignment and obligated Humble, along with its successors and assigns, to comply with the covenants within such agreement—specifically, to comply with the 1/8 net profits interest reserved by George Hamman, *et al.* as to the portion owned by Humble.

A dispute arose between Humble and the Hammans.  In June 1920, George Hamman, John Hamman, F.N. Bullock, and Clarion Oil Company, owners of the 1/8 net proceeds interest in the 20 acres at the time, entered into a settlement agreement and assignment with Humble, owner of the 7/8 working interest on that date.  (*See* ECF No. 19-1).  The 1920 Agreement recognized George Hamman, *et al.*'s 1/8 net proceeds interest in the land in which Humble had acquired a working interest through the Hogg-Japhet Lease—specifically, "Lots 17, 18, 19, and 20 of the Hogg Subdivision of the 160 acres out of the Bell and Varner Leagues, in Brazoria

County, Texas." (ECF No. 19-1 at 1). The 1920 Agreement also provided George Hamman, *et al*., among other things, with the option to convert their net proceeds into a working interest. (ECF No. 19-2 at 3–4). As this Court held in its previous Opinion, the 1920 Amendment preserved the Hammans' net profits interest in the Hogg-Japhet Lease despite the conveyance to Humble. (ECF No. 27 at 9). Additionally, the 1920 Amendment further bound any future successors or assigns of both George Hamman, *et al.* and Humble to the Amendment:

> All stipulations and agreements herein between the parties hereto shall extend to and include and be binding upon the heirs, administrators, executors, and assigns *of the individual parties hereto and the successors and assigns of said corporate parties hereto*.

(ECF No. 19-1 at 6) (emphasis added).

In 1969, Humble assigned the Hogg-Japhet Lease to Salmon Corporation ("Salmon"). (*See* ECF No. 48-20). Attached to the 1969 Assignment, a document titled "Exhibit A" initially provided a description of the property conveyed, which directly referenced the Hogg Lease and the Hogg-Japhet Lease:

> All of Assignor's interest in the oil, gas and mineral lease contract dated June 6, 1913, by and between Miss Ima Hogg et al, First Parties, and John Hamman, Second Party, of record in Volume 125, Page 53 of the Deed of Records of Brazoria County, Texas, *insofar and only insofar as said lease affects Lots 17, 18, 19, and 20 of the J.S. Hogg 160 acre subdivision out of the Martin Varner and J.H. Bell Leagues of Land, Brazoria County, Texas*, said property being assigned by Dan A. Japhet et al to Humble Oil & Refining Company on February 20, 1919, said instrument of record in Volume 152, Page 274 of the Deed Records of Brazoria County, Texas.

(ECF No. 48-20 at 3) (emphasis added). As will become relevant in this Court's discussion on "notice" below, Exhibit A then specified other conveyances to which the 1969 Assignment was subject to, including the 1920 Agreement between George Hamman, *et al*. and Humble:

> The above described lease is subject to the following:

(a) An Agreement dated February 20, 1919, as amended between Humble Oil & Refining Company and Dan A. Japhet et al.  It is specifically understood that Assignee takes the property subject to said Agreement and Assignor makes no representations as to what items should or will be charged as expenses or taken into consideration in determining profits under said Agreement.

(b) An Agreement dated June 22, 1920, by and between George Hamman, John Hamman, F.N. Bullock, Clarion Oil Company and Humble Oil & Refining Company.  It is specifically understood that Assignee takes the property subject to said Agreement and Assignor makes no representations as to what items should or will be charged as expenses or taken into consideration in determining profits under said Agreement.

(c) All valid easements, restrictions and rights of way affecting the lands described in the above lease which are now in force and effect.

(ECF No. 48-20 at 3).  The Hogg-Japhet Lease—included in subsection (a) of the above "subject to language"—incorporated the 1913 Assignment, through which the Hammans reserved their 1/8 net proceeds interests, and further bound Humble's successors and assigns to comply with the covenants within the Hogg-Japhet Lease (including covenants under the 1913 Assignment). Additionally, the 1920 Agreement between George Hamman, *et al.* and Humble is explicitly set forth in subsection (b) of the 1969 Assignment's "subject to" language.

Through a series of subsequent assignments, Lyle acquired an interest in Humble's 20-acre portion of the Hogg-Japhet Lease.  (ECF No. 18 at 9).  Lyle does not dispute that it is a successor-in-interest to Humble's working interest in the Hogg-Japhet Lease.  Moreover, neither party contends that the language of the 1913 Assignment or the 1920 Agreement is ambiguous. Rather, Lyle argues that none of the conveyances subsequent to the 1969 Assignment between Humble and Salmon bind any of Humble's successors to the 1913 Assignment, as amended by the 1920 Agreement, because none of the conveyances included the requisite language needed to provide notice to Humble's successors.  (ECF No. 50 at 5).  However, whether any or all of the conveyances following the 1969 Assignment from Humble to Salmon specifically referred to the

1913 Assignment and the 1920 Agreement is irrelevant in determining whether Lyle was on "notice" of those assignments and the covenants contained within, thereby binding Lyle to account to the Hammans' pursuant to their 1/8 net profits interest in the Hogg-Japhet Lease.

Because the 1913 Assignment is a recorded instrument, any subsequent purchaser is on constructive notice of its existence. If Lyle has a complaint with respect to the disclosures made by intervening owners, that complaint must be with those intervening owners.

*Covenant Running with the Land*

Lyle is bound to account to the Hammans pursuant to their 1/8 net profits as set forth in the 1913 Assignment, because the interest is a covenant that runs with the land. A net profits interest in oil and gas properties is a real property interest.[15] *See In re Breitburn Energy Partners L.P.*, 571 B.R. 59, 65 (Bankr. S.D.N.Y. 2017) ("While older cases treated a net profits interest as a contractual right rather than a property interest, the current view seems to treat net profits royalty interests like true overriding royalty interests as interests in realty.") (citations omitted)); *T-Vestco Litt-Vada v. Lu-Cal One Oil Co.,* 651 S.W.2d 284, 292 (Tex. App.—Austin 1983, writ ref'd n.r.e.) (seeking net profits interest based on ownership of land, which court held is an interest in land for purposes of determining venue). The 1913 Assignment is a contract to convey interests in oil and gas leases. The 1913 Assignment, at least with respect to Lots 17, 18, 19, and 20 of the Hogg subdivision, subject of the Hogg-Japhet Lease from which Lyle derives its working interest, involves a covenant running with the land. *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 909 (Tex. 1982); (ECF No. 19-1 at 1).

---

[15] "An 'overriding royalty' is an interest in oil and gas produced at the surface, *free of the expense of production*, and carved from the working interest held under an oil and gas lease, rather than from the royalty reserved by a landowner on the severance of the mineral estate." *In re Breitburn Energy Partners, L.P.*, 571 B.R. 59, 65 (Bankr. S.D.N.Y. 2017) (citing *T-Vestco Litt-Vada v. Lu-Cal One Oil Co.,* 651 S.W.2d 284, 292 (Tex. App.—Austin 1983, writ ref'd n.r.e.)). In contrast, "a net profits interest is a share of gross production under which the operator pays all costs of exploration and development and, after satisfying such costs from the proceeds of production, shares the profits on an agreed basis with the owner of the net profits interest." *Id.* (quoting 2 WILLIAMS AND MEYERS, OIL AND GAS LAW § 424.1 at 439 (1981)).

Texas caselaw contains some variations on the requirements for a covenant that runs with the land.  The Fifth Circuit, however, has elicited the following four requirements—a covenant runs with the land when it: (i) touches and concerns the land; (ii) relates to a thing in existence or specifically binds the parties and their assigns; (iii) is intended by the original parties to run with the land; and (iv) when the successor to the burden has notice.  *In re Energytec, Inc.*, 739 F.3d 215, 221 (5th Cir. 2013) (citing *Inwood N. Homeowners' Ass'n, Inc. v. Harris,* 736 S.W.2d 632, 635 (Tex. 1987)).  There must also be privity of estate between the parties when the covenant is made.  *Id*. (citation omitted).

a.  *Touches and Concerns the Land*

In assessing whether an interest touched and concerned the land, the Texas Supreme Court in *Westland Oil* noted that:

> One of the two often cited statements of the requirement is that a covenant will run if it affected the nature, quality or value of the thing demised, independently of collateral circumstances, or if it affected the mode of enjoying it . . .
>
> If the promisor's legal relations in respect to the land in question are lessened— his legal interest as owner rendered less valuable by the promise—the burden of the covenant touches and concerns the land; if the promisee's legal relations in respect to that land are increased—his legal interest as owner rendered more valuable by the promise—the benefit of the covenant touches and concerns the land.

*Westland Oil*, 637 S.W.2d at 910 (citing Howard R. Williams, *Restrictions on the Use of Land: Covenants Running with the Land at Law*, 27 Tex. L. Rev. 419, 429 (1949)).  Notably, however, the Fifth Circuit has "rejected [the] argument that if a covenant affects the value of the land it necessarily runs with the land."  *In re Energytec*, at 224.  More is required under Texas Law.  "[E]ven when a covenant impacts the value of the land, it must still affect the owner's interest in the property or its use in order to be a real covenant."  *Id*. (quoting *El Paso Refinery, LP v. TRMI Holdings, Inc. (In re El Paso Refinery, LP)*, 302 F.3d 343, 357 (5th Cir. 2002)).

Here, without question, Lyle's working interest in the Hogg-Japhet Lease is affected or impacted by the Hammans' 1/8 net profits interest.  Pursuant to the 1913 Assignment, Producers promised to comply with George Hamman, *et al*.'s reservation of a 1/8 net proceeds interest, which would trigger or otherwise come to fruition in the event that Producers "should discover and produce oil, gas, or other minerals," under the Hogg Lease.  (ECF No. 19-3 at 6).  The 1913 Assignment explicitly obligated Producers' "successors and assigns to carry" and be bound by that 1/8 net profits interest.  (ECF No. 19-3 at 7).  Producers and its successors-in-interest were obligated to account to the Hammans for a 1/8 net profits interest in any proceeds of production encumbered by that interest.  This includes the Hogg-Japhet Lease, which was carved from the original Hogg Lease and from which Humble derived its working interest.  (*See* ECF No. 19-10).  Therefore, the Hammans' 1/8 net profits interest, which encumbered not only Producers and Humble, but any and all of their successors and assigns, clearly affected the nature and value of the working interest in the Hogg-Japhet Lease by requiring payment on account of the Hammans' net profits interest whenever there was production.  (ECF Nos. 18 at 5; 19-3 at 6–7).  It burdened the promisor's estate—in this case, Producer's and eventually Humble's working interest—and rendered it "less valuable" by allowing George Hamman, *et al*. and his successors to benefit from the promise of a 1/8 net profits interest from any proceeds of production in the 20 acres.  *Westland Oil*, 637 S.W.2d at 910.  Accordingly, the first requirement is met.

   b.  *Relates to the thing in existence or binds successors*

Under the 1913 Assignment, Producers agreed to bind itself, "its successors and assigns to carry the . . . 1/8 net proceeds from the sale of products so produced . . . ."  (ECF No. 19-3 at 6).  The 1913 Assignment was thereafter included in the Hogg-Japhet Lease's account of the passage of title, and further bound Humble's successor and assigns to the recitations within that

conveyance. (ECF No. 19-1 at 4–5). Furthermore, the covenant to account for the Hammans' 1/8 net profits interest relates to the same interest in land—the 20 acres in the Hogg-Japhet Lease that Dan Japhet conveyed to Humble, all of which derived from the original Hogg Lease. Accordingly, the second requirement is met.

   c.   *Parties intend to create covenant running with the land*

   "To create a real covenant, the contracting parties must also intend at the time of the agreement that the covenant run with the land." *Fort Worth 4th Street Partners, L.P. v. Chesapeake Energy Corp.*, 882 F.3d 574, 578 (5th Cir. 2018); *see In re Energytec*, at 221 (noting the intent must derive from the "original parties"). "Courts judge intent by first looking to the text of the instrument itself to determine if there is language expressly stating that the covenant binds successors." *Id.* (citing *Billington v. Riffe*, 492 S.W.2d 343, 346 (1973)).

   As provided in detail above in the *Relevant Conveyances* section, here it is clear that the original parties to the 1913 Assignment intended that the 1/8 net profits interest in the Hammans run with the land. The 1913 Assignment explicitly reserved a 1/8 net profits interest in the Hammans and made Producers and any of its successors and assigns subject to the conditions within the assignment. (ECF No. 19-2 at 6). The Hogg-Japhet Lease, from which Lyle derives its working interest, provided an account of the passage of title of the Hogg Lease, which included the 1913 Assignment. (ECF No. 19-10 at 3). It also explicitly bound any of Dan Japhet's successors and Humble's successors and assigns to the terms and assignments detailed within the Hogg-Japhet Lease. (ECF No. 19-10 at 5). Thus, it is clear that not only the original parties that created the 1/8 net profits interest in the 1913 Assignment intended that the net profits interest run with the land, but their successors and assigns explicitly carried that covenant

forward and bound themselves to comply with the covenant through clear language to that effect. Accordingly, the third requirement is met.

   *d.   Successor has notice of the covenant*

   The Lyle Defendants[16] contend that they are not bound by the 1913 Assignment or the 1920 Agreement, because none of the instruments in the chain of title make reference to the 1913 Assignment, and although some reference the 1920 Agreement, "the Plaintiffs withheld and concealed the 1920 . . . Agreement from production" in this and a related lawsuit, such that the Lyle Defendants were deprived of notice of the covenants thereunder.  (ECF No. 50 at 5).

   Although the Hammans move for partial summary judgment "as to [] liability for the net profits accounting required under the 1913 Assignment *and* the 1920 Agreement," such relief is not warranted where it was not a part of their original complaint.  (ECF Nos. 1-2; 48 at 3 (seeking a determination of liability under the original state court complaint only as to the 1913 Assignment and not the 1920 Agreement) (emphasis added))).  However, even if the 1920 Agreement claim were allowed and there was no notice of the 1920 Agreement in the conveyances from which the Lyle Defendants derive their interest, the Lyle Defendants would have no complaint.  The Hammans claims do not derive from the 1920 Agreement; rather, the Hammans acquired their net profits interest through the recorded 1913 Assignment.  The Lyle Defendants attempted to use the 1920 Agreement to argue that the Agreement divested the Hammans of their rights under the 1913 Assignment.  This Court denied that same claim through its previous Memorandum Opinion.  Thus, the absence of recordation or notice does not benefit

---

[16] The Court will address the issue of notice separately for each Lyle Defendant given the separate conveyances from which each derived their working interests in the Hogg-Japhet Lease.  The Lyle Defendants consist of: (i) Jennie Kay Lyle Bierscheid, executrix of the estate of Kenneth R. Lyle, deceased ("Kenneth R. Lyle"), (ii) Lyle Engineering Company, (iii) Houston Bluebonnet, LLC, (iv) E&H, LP ("E&H"), (v) American Universal Investment, Co. ("American Universal"), and (vi) Esther Suckle, Trustee of the Suckle 1999 Living Trust ("Suckle").  (*See* ECF No. 68).

the Lyle Defendants in any manner in this proceeding.  Even assuming that the Lyle Defendants are not bound by the 1920 Agreement based on an absence of notice in the chain of title subsequent to the 1969 Assignment, the Hammans' rights under the 1913 Assignment subsist today.  The dispute in the complaint is 107 years old, not 100 years old.

Moreover, that the instruments in the chain of title subsequent to the 1969 Assignment from Humble to Producers—the chain of title from which the Lyle Defendants derive their working interest in the Hogg-Japhet Lease—do or do not reference the 1913 Assignment is not determinative as to the question of whether the Lyle Defendants received adequate notice of the Hammans' net profits interest such that the interest constitutes a covenant running with the land.

The 1913 Assignment, like the Hogg-Japhet Lease, is a recorded instrument.  (ECF Nos. 19-3; 19-10 (noting both assignments were recorded in Brazoria County, Texas)).  An instrument that is properly recorded in the proper county is: (1) notice to all persons of the existence of the instrument; and (2) subject to inspection by the public.  TEX. PROP. CODE § 13.002l; *see Trial v. Dragon*, 2019 WL 2554130, at *9 n.4 (Tex. June 21, 2019) (citing the same); *Jones v. Wells Fargo Bank* (*In re Jones)*, 573 B.R. 665, 677 (Bankr. N.D. Tex. 2017) ("Under Texas law, constructive notice is given by properly recorded instruments and charged to a person as a matter of law, regardless of the person's actual knowledge."); *Mooney v. Harlin*, 622 S.W.2d 83, 85 (Tex. 1981) ("A person is charged with constructive notice of the actual knowledge that could have been acquired by examining public records.").  The Lyle Defendants cannot claim innocent purchaser status when the assignment at issue involves a recorded instrument.  *See* TEX. PROP. CODE § 13.001(a) ("A conveyance of real property or an interest in real property or a mortgage or deed of trust is void as to a creditor or to a subsequent purchaser for valuable consideration

without notice ***unless the instrument has been acknowledged, sworn to, or proved and filed for record as required by law***." (emphasis added)).

Thus, the Lyle Defendants had constructive notice of the 1913 Assignment.

Even so, the Lyle Defendants claim that they could not have been apprised of the 1913 Assignment in light of its omission from every conveyance following the 1969 Assignment from Humble to Salmon.  In essence, they could not have been apprised of its existence even by looking through the chain of title.  "It is well settled that, 'a purchaser is bound by *every* recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in the chain of title under which he claims.'"  *Westland Oil*, 637 S.W.2d at 908 (citations omitted).  In *Westland Oil*, Texas Supreme Court noted that:

> The rationale of the rule is that any description, recital of fact, or reference to other documents puts the purchaser upon inquiry, and he is bound to follow up this inquiry, step by step, from one discovery to another and from one instrument to another, until the whole series of title deed is exhausted and a complete knowledge of *all the matters referred* to and affecting the estate is obtained.

*Id*. (citations omitted) (binding parties to an *unrecorded* letter in light of its reference within the conveyance at issue).  "This is so regardless of whether the instrument is recorded or whether he has actually seen or read it, or has any knowledge of its contents."  *Tuggle v. Cooke*, 277 S.W.2d 729, 731 (Tex. Civ. App.—Fort Worth, 1955).

On August 16, 1991, Mary Louise Hablinski assigned a 15.875% working interest to Kenneth R. Lyle[17] in the Hogg-Japhet Lease.  (ECF No. 48-46 at 1).  The assignment from Hablinski to Kenneth Lyle contained the same "subject to" language as the one that appeared in Exhibit A of the 1969 Assignment from Humble to Salmon:

The above described lease is subject to the following:

---

[17] Jennie Kay Lyle Bierscheid is the executrix of the estate of Kenneth R. Lyle, deceased.

(a) An Agreement dated February 20, 1919, as amended between Humble Oil & Refining Company and Dan A. Japhet et al.  It is specifically understood that Assignee takes the property subject to said Agreement and Assignor makes no representations as to what items should or will be charged as expenses or taken into consideration in determining profits under said Agreement.

(b) An Agreement dated June 22, 1920, by and between George Hamman, John Hamman, F.N. Bullock, Clarion Oil Company and Humble Oil & Refining Company.  It is specifically understood that Assignee takes the property subject to said Agreement and Assignor makes no representations as to what items should or will be charged as expenses or taken into consideration in determining profits under said Agreement.

(c) All valid easements, restrictions and rights-of-way affecting the lands described in the above lease which are now in force and effect.

(ECF No. 48-46 at 1).  Thus, Hablinski's assignment to Kenneth Lyle explicitly stated that Kenneth Lyle's interest was "subject to" the Hogg-Japhet Lease.  (ECF No. 48-46 at 1).

Moreover, the Hogg-Japhet Lease provided a detailed account of conveyances which came before it as it pertained to the Hogg Lease, and the 20 acres carved from that lease, including the 1913 Assignment.  Thus, the recitation within the Hogg-Japhet Lease placed the burden on Kenneth Lyle to "follow up this inquiry."  *Westland Oil*, 637 S.W.2d at 908.  Kenneth Lyle was on inquiry notice:

If a fact is recited in a deed through which a party claims title to land, he is held to have notice of the fact.  If the facts recited (in a deed through which a party claims title) are sufficient to put a man upon inquiry, he is charged with notice of those facts which might have been obtained by prosecution of inquiry with reasonable diligence.  This is for the reason that the purchaser is entitled to see all the muniments of title, and therefore is presumed to have seen them.  If, any deed through which a purchaser's title is adduced there is a recital or reference to another deed or instrument collateral to the chain of title in which he makes his purchase (or not a part of the direct series), *he would, by means of such recital or reference, have notice of this collateral instrument, or its contents*, and all the facts indicated, by which it might be ascertained, *through inquiry prosecuted with reasonable diligence*, and such notice extends to all deeds and other instruments failing properly within the preceding rules, *whether recorded or unrecorded*.

*Cooke*, 277 at 731 (emphasis added); *see Westland Oil*, 637 S.W.2d at 908.

> Accordingly, the purchaser is charged with knowledge of any equity or interest of a third person which is disclosed or recognized by a conveyance through which he claims, as well as notice of any fact recited or revealed in such conveyance, in the certificate of acknowledgement, or in another instrument to which the conveyance refers. *And when a fact is recited which is sufficient to put a prudent man on inquiry, the purchaser is charged with notice of facts which might have been ascertained by a proper inquiry.*

*Cooke*, 277 S.W.2d at 731–32 (emphasis added).

Since it was Kenneth Lyle's duty to investigate the assignments to which he was subject to upon obtaining an interest in the Hogg-Japhet Lease, Kenneth Lyle is also charged with notice of the contents of the 1913 Assignment, as incorporated by the Hogg-Japhet Lease. *Westland Oil,* 637 S.W.2d at 908 (holding parties "were charged with the duty of inspecting [the] document" which referenced the letter at issue). It was Kenneth Lyle's responsibility to inform himself of the covenants contained within the assignment granting him a working interest in the Hogg-Japhet Lease. Accordingly, Kenneth Lyle received notice of his duties and obligations to the Hammans as set forth in the 1913 Assignment, by virtue of the covenants in the Hogg-Japhet Lease, which was explicitly included in the assignment from Mary Louis Hablinski to Kenneth Lyle. (ECF Nos. 19-10 at 2–5; 48-46 at 1).

Importantly, the 1913 Assignment is a recorded instrument. *In re Jones*, 573 B.R. at 677 ("Under Texas law, constructive notice is given by properly recorded instruments and charged to a person as a matter of law, *regardless* of the person's actual knowledge." (emphasis added)). Kenneth Lyle, therefore, had constructive notice of the 1913 Assignment and was charged with inquiry notice in light of the language within the assignment from Hablinski. *Id.* ("Knowledge of a recorded interest in real property puts a subsequent purchaser under a duty to make a reasonable inquiry into the status of that interest. At a very minimum, constructive notice of a recorded deed of trust puts a subsequent purchaser under a duty to make a reasonable inquiry

into the status of that deed."); *see Clear Lake Apartments, Inc. v. Clear Lake Util., Co*., 537 S.W.2d 48, 51 (Tex. Civ. App.—Houston [14th Dist.], 1976) ("[A] purchaser must take notice of all recorded instruments within his chain of title and [a]ffecting his title.").

Not only is the 1913 Assignment recorded (making it constructively known to the world), but all of the assignments from which the Lyle Defendants derived their working interest make reference to the Hogg-Japhet Lease.  (ECF Nos. 48-32 at 5; 48-34 at 3; 48-36 at 10; 48-49 at 1; 48-50 at 1).  Accordingly, all Lyle Defendants are charged with notice of the 1913 Assignment, which is a recorded instrument in the Brazoria County records.  (ECF No. 48-1 at 3 ("[R]ecorded in Volume 125, Pages 84-90, Deed Records of Brazoria County, Texas . . . .")).[18]

### e.  Privity of estate exists

Under the last requirement, "the covenant must be made between parties who are in privity of estate at the time the covenant is made, and must be contained in a grant of the land or in a grant of some property interest in the land." *Wayne Harwell Prop. v. Pan Am. Logistics Ctr., Inc.*, 945 S.W.2d 216, 218 (Tex. App.—San Antonio, 1997) (citing *Panhandle & S.F.R. v. Wiggins*, 161 S.W.2d 501 (Tex. Civ. App.—Amarillo 1942, writ ref'd w.o.m.)).  "Privity of estate means that there must be a mutual or successive relationship to the same rights of property." *Id*.  "Texas has accepted the view that this requirement is satisfied by either simultaneous or successive interests in the same land."  *Id*. (citing Howard R. Williams, *Restrictions on the Use of Land: Covenants Running with the Land at Law*, 27 Tex. L. Rev. 419, 446 (1949)).

---

[18] The Court notes that although the Hammans list Lukin Gilliland as a defendant in their Motion for Partial Summary Judgment, Lukin does not appear to be one of the Lyle Defendants.  (ECF Nos. 48, 68).  Additionally, although Lyle Engineering Company is one of the Lyle Defendants, it is not referenced in the chart provided by the Hammans in assessing damages.  (ECF No. 48 at 9).  Furthermore, although the Hammans have attached an assignment from E&H, LP to Suckle as an exhibit to their Motion for Partial Summary Judgment, there does not appear to be a document or deed showing when E&H acquired their working interest in the Hogg-Japhet Lease. (*See* ECF No. 48).  However, the conveyance from E&H to Suckle, like every other relevant conveyance, references the Hogg-Japhet Lease.

In 1913, George Hamman, *et al.*, conveyed the Hogg Lease to Producers, under which it reserved a 1/8 net profits interest, and from which Producers became the working interest owner. In 1919, Dan Japhet, current owner of the Hogg Lease at the time, conveyed a portion of the Hogg Lease to Humble, from which then Humble acquired its working interest. Thereafter in 1920, Humble and the Hammans entered into an agreement concerning the Hammans' 1/8 net proceeds interest and Humble's working interest in the Hogg-Japhet Lease. Thus, all assignments and agreements, derive from the original contract—the Hogg Lease. The Hammans are direct successors of George and John Hamman, who each obtained a 1/5 of the 1/8 net profits interest in the Hogg Lease. Lyle is a successor-in-interest to Humble's working interest in the Hogg-Japhet Lease, under which Dan Japhet conveyed a portion of the working interest in the Hogg Lease to Humble. Therefore, privity of estate exists.

Accordingly, the Lyle Defendants are bound by the Hammans' 2/5 of 1/8 net profits interest reserved in the 1913 Assignment. The Lyle Defendants must account to the Hammans for their 5.00% of the proceeds of production under the Hogg-Japhet Lease.

### Four-Year Statute of Limitations

Lyle argues that the Hammans' claims are foreclosed by the four-year statute of limitations, and therefore, they are not entitled to recovery on their 5.00% net profits interest in the Hogg-Japhet Lease. (ECF No. 68 at 3–4). The Hammans contend, however, that they only seek to recover the net profits due within the four years prior to filing suit and therefore, the four-year statute of limitations does not act as a total bar on the recovery of their claims.[19] (ECF No. 70 at 2 (citing TEX. CIV. PRAC. & REM CODE § 16.004(a)).

---

[19] Lyle argues that the 1920 Agreement operated "as an accord and satisfaction of any and all disputes between" Humble and George Hamman, *et al.* (ECF No. 50 at 7). Therefore, the Hammans are not entitled to recovery of any of the $182,451.72 "due or owing" and any of the payments otherwise not paid by Humble. (ECF No. 68 at 10). However, the Hammans' claims are for amounts due from four years prior to the filing of the suit at issue—time

A net profits interest in oil and gas properties is a real property interest.  *T-Vestco Litt-Vada v. Lu-Cal One Oil Co.,* 651 S.W.2d 284, 292 (Tex. App.—Austin 1983, writ ref'd n.r.e.) (seeking net profits interest based on ownership of land, which court held is an interest in land for purposes of determining venue).  The 1913 Assignment from which the Hammans' derive their net profits interest is a contract to convey interest in oil and gas leases.  Thus, the Hammans' damages claim derives from an alleged breach of contract based on unpaid royalties of their 5.00% net profits interest in the Hogg-Japhet Lease.

Both a breach of contract claim, and a claim for specific performance of a contract for conveyance of real property have a four-year statute of limitations.  Tex. Civ. Prac. & Rem Code § 16.004(a)); *see Bright & Co. v. Holbein Family Mineral Trust*, 995 S.W.2d 742, 745 n.4 (Tex. App.—San Antonio, 1999) (noting breach of contract and unpaid royalty claims must be brought within four years).  However, the four-year statute of limitations only bars damages which accrue more than four years prior to the filing of the suit.  *Headington Oil Co. v. White*, 287 S.W.3d 204, 214 (Tex. App.—Houston [1st Dist.] 2010, pet denied); *see Holbein*, 995 S.W.2d at 744–45 (noting the four-year statute of limitations barred all unpaid royalty claims except those filed from four years prior to the filing of the suit).

Here, the 1913 Assignment provided that the obligation to pay would continue from the time the working interest discovered and produced oil, gas, or other minerals during the life of such leases:

> It is further agreed and understood that if the second party should discover and produce oil, gas, or other minerals in and under lands covered by the leases assigned *herein during the life of such leases* then the said second party agrees, obligates and binds itself, its successors and assigns to carry the said George Hamman, J.C. McKallip and F.N. Bullock for one eighth (1/8) of the net proceeds from the sale of the products so produced from said lands.

under which the Lyle Defendants owned the working interest in the Hogg-Japhet Lease.  The Hammans do not state a claim for any money owed to the Hammans by Humble.

(ECF No. 19-3 at 6).  The real property contract at issue calls for periodic payments—a 1/8 net profits interest from the sale of production of the property conveyed.  *Lyle v. Jane Guinn Revocable Trust*, 365 S.W.3d 341, 355 (Tex. App.—Houston [1st Dist.] 2010) ("Therefore, the statute of limitations here, where the 1919 Assignment contemplated a monthly accounting and payment for the one-fourth royalty, only bars recovery of the royalty payments accruing more than for years prior to the filing of the suit." (citing *Headington Oil Co.,* 287 S.W.3d at 214)). The Hammans correctly note that each of the Plaintiffs' entitlement "is measured from four years prior to the Plaintiff filing suit," rather than the date from which a breach first occurred, dating back 40 years, as Lyle disputes.  (ECF Nos. 48 at 9; 50 at 8).

The Hammans allege in their pleadings that each of the Hamman Plaintiffs filed suit as provided below:

    i.      The George and Mary Josephine Hamman Foundation filed suit in
            November 2009; therefore, it is entitled to damages from November 2005
            to November 2009.

    ii.     Laura Hamman Fain filed suit in August 2012; therefore, she is entitled to
            damages from August 2008 to August 2012.

    iii.    Elizabeth Hamman Oliver filed suit in August 2012; therefore, she is
            entitled to damages from August 2008 to August 2012.

(ECF No. 48 at 9).  Lyle does not dispute the time provided by the Hammans.  Rather, Lyle argues that "the Texaco and Dorado Division Orders[20] [] show Plaintiffs were not receiving payments from 1987," and were not paid by "any of the intervening purchasers or interest owners for over 40 years."  (ECF No. 50 at 7).  Lyle claims that waiting over 40 years to assert a claim is unreasonable, and therefore the Hammans are not entitled to recovery, or have otherwise

---

[20] The Texaco and Dorado division orders attached to Lyle's pleadings provide payments to parties which are not the Hammans.  (ECF No. 50-4 at 9–11).  The Hammans do not dispute that the Lyle "Defendants have never paid the Hammans' net profits interest since taking over the lease in 1990."  (ECF No. 70 at 3).

waived any claim to any alleged unpaid royalties.  (ECF No. 50 at 8).  However, as discussed

above, the Hammans' net profits interest is an interest that runs with the land, which binds Lyle

to the terms of the 1913 Assignment.  The four-year statute of limitations only precludes

payments from four years prior to the filing of the suit.  Accordingly, the Hammans' claims are

not barred by Texas' four-year statute of limitations on unpaid royalty claims.  *Headington Oil*,

287 S.W.3d at 214; *Holbein*, 995 S.W.2d at 744–45.  Lyle is bound to account to the Hammans

for 5.00% of the proceeds of production from four years prior to the filing of their suits, and so

long as there exists production under the 20 acres, subject of the Hogg-Japhet Lease.  *In re*

*Energytec, Inc.,* 739 F.2d 215, 225 (5th Cir. 2013) (noting "that so long as there is relevant

production . . .the royalty [] is binding on successors to the leases").

## II.    Damages

The Hammans seek damages in the amount of $100,379.16 pursuant to their 5.00% net

profits interest in the Hogg-Japhet Lease.  (ECF No. 48 at 9).  The breakdown of those damages

is as follows:

| Plaintiff | Net Profits Interest | Total Owed |
|---|---|---|
| The Hamman Foundation | 1/5 of 1/8 | $54,569.18 |
| Laura Hamman Fain | 3/16 of 1/5 of 1/8 | $5,852.12 |
| Elizabeth Hamman Oliver | 3/16/ of 1/5 of 1/8 | $5,852.12 |
| Henry R. Hamman | 5/8 of 1/5 of 1/8 | $34,105.74 |

(ECF Nos. 48 at 9; 48-57 at 1–16).  Lyle does not dispute the alleged amounts owed; rather, it

argues that it is not bound to pay those amounts, asserting affirmative defenses.  (*See* ECF No.

50).

The Hammans further assert that the Lyle Defendants hold a working interest in the

Hogg-Japhet Lease in the following amounts:

| Defendant | Working Interest | Total Owed |
|---|---|---|
| Lukin Gilliland | 0.0215% | $29.01 |
| American Universal | 9.00% | $12,142.43 |
| Houston Bluebonnet | 27.125% | $36,595.95 |
| Kenneth R. Lyle (and his estate) | 27.125% | $36,595.95 |
| E&H, L.P. | 5.625% | $834.39 |
| Suckle Trustee | 5.625% | $6,754.63 |
| CG Enterprises | 5.625% | $7,426.80 |

(ECF No. 48 at 9).[21]  Lyle also does not dispute the alleged working interests owned under the Hogg-Japhet Lease; rather, as noted above, it asserts affirmative defenses, which attempt to negate responsibility for payment of those amounts.  (*See* ECF No. 50).

Specifically, Lyle argues that it is not responsible for the payment of any damages to the Hammans, given that: (i) the Hammans have suffered no damages; (ii) genuine issues of fact exist as to liability; (iii) the Hammans have asserted erroneous damages claims by excluding both ordinary operating expenses and fees from their calculations, and any attorney's fees Lyle has incurred in connection with ownership of the property; and (iv) there was no assumption or agreement to pay any of Humble's debts or obligations created under the 1920 Agreement.  (ECF No. 50 at 3, 5 ("Nothing in the 1913 Assignment, as modified, allows the exclusion of legal fees and expenses from operating expenses incurred in connection with the ownership and operation of such wells.  Nothing in the 1920 Settlement Agreement and Assignment would exclude attorney's fees from calculations of the additional restrictive credit.  Thus, the revenues and expenses are disputed.")).

No genuine issue of fact exists as to liability—Lyle is bound to account to the Hammans pursuant to their 5.00% net profits interest in the Hogg-Japhet Lease from four years prior to each of their respectively filings, and so long as production in the 20 acres, subject of the Hogg-

---

[21] The Hammans provide that E&H, L.P.'s liability ended on October 30, 2010, and that Suckle's liability accrues after October 30, 2010.  (ECF No. 48 at 9).  Additionally, the Hammans have filed a default judgment against C.G. Enterprises, Inc.  (*See* ECF No. 65).  The Hammans' motion for default judgment against C.G. will be adjudicated after this Court's decision on damages.

Japhet Lease, exists.  The Hammans claims are not barred by the four-year statute of limitations.
Contrary to Lyle's argument, the Hammans have not asserted any claims as to any debts owed by
Humble.  Rather, the Hammans' damages claims are pursuant to their 5.00% net profits interest
in the Hogg-Japhet lease.  Accordingly, the Court will focus on Lyle's claim that the damages
calculations are incorrect.

As evidence of their damages, the Hammans provide Exhibits D, E, and F, which outline
amounts due from monthly production under the Hogg-Japhet Lease in accordance with each of
the Plaintiff's net profits interest.  (*See* ECF Nos. 48-56, 48-57, 48-60).  The Hammans contend
that the figures provided in Exhibit E show "undisputed revenue and expense figures."  (ECF
No. 48 at 9).  Moreover, Exhibit F is a demonstrative, which "takes these undisputed numbers
and performs calculations to determine" the Hammans' damages award by taking the net profits
owed to each Plaintiff during each time period in question and multiplying those by each
Plaintiff's share and each Defendant's working interest.  (ECF No. 48 at 9).

The Hammans support their damages' calculations through an affidavit prepared by Lee
S. Gill, which is labeled as Exhibit I and attached to the Hammans' pleadings.  (ECF No. 48-60).
Gill attests that he is one of the Hammans' attorneys in this proceeding, and that he was also "the
attorney for the Plaintiffs[22] in cause No. 30776, 149th District Court of Brazoria County, Texas,
styled *Estate of Jane Japhet Guinn et al v. Kenneth R. Lyle et al* ('Related Litigation')."  (ECF
No. 48-60 at 1).  Gill states that Exhibits D and E are "true and correct" copies of trial exhibits
admitted in the Related Litigation.  (ECF No. 48-60 at 2).  Gill further attests that Exhibit F was
thereafter prepared in reliance on Exhibits D and E.  (ECF No. 48-60 at 2 ("Exhibit F . . . was

---

[22] The Plaintiffs in the Related Litigation were "heirs of Dan A. Japhet," collectively the "Japhet Heirs."  *Lyle v. Jane Guinn Revocable Trust*, 365 S.W.3d 341, 345 (Tex. App.—Houston [1st Dist.] 2010).

prepared (using Microsoft Excel) from the stipulated expenses and revenue data contained in Exhibits D and E.")).

Lyle makes various objections to the Hammans' exhibits.  (*See* ECF No. 50).   Under Federal Rule of Civil Procedure 56, the facts set out to support or oppose a motion for summary judgment must be admissible into evidence.  Fed. R. Civ. P. 56(c)(4).  "In the Fifth Circuit, it is well settled that 'the admissibility of summary judgment evidence is subject to the same rules of admissibility applicable to trial.'"  *Lohan v. Morgan Stanley DW, Inc*., 652 F. Supp. 2d 812, 823 (S.D. Tex. 2009) (quoting *Resolution Trust Corp. v. Starkey*, 41 F.3d 1018, 1024 (5th Cir. 1995)).  The parties must present evidence that is "capable of being 'presented in a form that would be admissible into evidence.'"  *Flores v. Harris*, 2019 WL 1426313, at *6 (S.D. Tex. Mar. 29, 2019) (citations omitted).  "The court cannot consider unauthenticated documents or hearsay."  *Id*.  The court will also not consider legal conclusions or statements that are not based on personal knowledge.  *Id*.

Lyle objects to Exhibit I, Lee Gill's affidavit.  Lyle claims Gill's affidavit is hearsay, conclusory, and inadmissible as summary judgment evidence because Gill is not qualified or designated as an expert.  (ECF No. 50 at 13).  Federal Rule of Civil Procedure 56(e) states, in pertinent part:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.  If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.  The Court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Fed. R. Civ. P. 56(e).  The Hammans do not attempt to introduce Gill as an expert witness, nor need he be an expert witness to support the Hammans' damages claim.  All that is required is that Gill's affidavit "be made on personal knowledge," setting out "facts that would be

admissible in evidence and show that [he] is competent to testify on the matters stated." Fed. R. Civ. P. 56(e).

In his affidavit, Gill states that he has personal knowledge of the facts stated within the affidavit. (ECF No. 48-60 at 1). Gill declares that he is one of the attorneys for the Hammans in the current proceeding and that he was the attorney of record for the Japhet Heirs in the Related Litigation. (ECF No. 48-60 at 1). Gill further provides that Exhibits D and E are "true and correct copies of Trial Exhibits 3 and 4 [] which were admitted in evidence" without objection in the trial on the merits in that Related Litigation. (ECF No. 48-60 at 2). Although Gill's affidavit demonstrates that he has "personal knowledge" of the fact that Exhibits D and E were introduced in the Related Litigation without objection, his affidavit does not demonstrate that he has personal knowledge of the contents within those exhibits. Gill has not attested that the amounts shown in the charts in Exhibits D and E are an accurate and true representation of production in the 20 acres subject of the Hogg-Japhet Lease from the years 2000 to 2017. Rather, Gill attests that opposing counsel has purportedly conceded that the amounts shown are "accurate" such that he did not object to the documents' introduction. Gill is attempting to attest to opposing counsel's knowledge of production in the 20 acres, rather than his own knowledge. Thus, Gill's affidavit is hearsay, and inadmissible as summary judgment evidence. *Flores*, 2019 WL 1246313, at *6.

Lyle further objects to' Exhibit F, arguing that the Hammans' net profits calculations are: (i) unauthenticated, (ii) improperly calculated, (iii) without proper foundation, (iv) which do not include all requisite expenses or categories of expenses, and (v) inadmissible as summary judgment evidence."[23] (ECF No. 50 at 13). Specifically, Lyle argues that the Hammans'

---

[23] Lyle also objects to Exhibit I on the basis that "Paragraph 3 is based on improper belief and fails to establish how the alleged title could exist in light of final judgments in *Hogg v. Sheffield*, where the Hammans had no interest."

calculations are improper because the "calculation formula used is not derived from the documents or law and Gill is not qualified or designated as an expert." (ECF No. 50 at 13). Furthermore, Lyle notes that "[n]othing in the 1920 Settlement Agreement and Assignment would exclude attorney's fees from the calculations of the additional restrictive credit. Thus, the revenues and expenses are disputed." (ECF No. 50 at 5). The Hammans do not address Lyle's objections to their exhibits. Although Gill is not required to be designated as an expert witness to support the Hammans' damages claim, the Court will not consider his affidavit in determining damages because it does not meet the requirements of Federal Rule of Procedure 56(e). The court will address Lyle's claim that the Hammans' damages are based on improper calculations.

Lyle claims that the damages were improperly calculated, but does not provide a clear objection to anything other than the exclusion of legal fees from production as provided for in Hammans' Exhibit F. (ECF No. 50 at 5–6). Specifically, Lyle argues that "[a]ll damages are in error" and that "operators and working interest owners' legal fees are a necessary expense of operations and constitute a permissible working interest expense." (ECF No. 50 at 5). As support for Lyle's proposition that legal fees should be "included in the calculation of the profits due to the owner of a net profits interest", Lyle cites Frank W.R. Hubert, Jr. & James A. Taylor, *Creation and Conveyance of Oil and Gas Leasehold Burdens § 14.03[2]*, 31 ROCKY MTN. MIN. L. INST. 14 (1985). Notably, however, Lyle includes within the parenthetical following this citation, the following: "explaining that both direct and indirect costs of production, *including 'legal fees,' should in most instances be deducted* in computing net proceeds." (ECF No. 50 at 6) (emphasis added)). Thus, Lyle's own pleadings cut against his argument that legal fees

---

(ECF No. 50 at 13). As provided above, the Court in a separate Opinion held that the Texas Supreme Court's decision in *Hogg v. Sheffield* did not have any preclusive effect on the Hammans' net profits interest. (ECF No. 27 at 11).

should not be deducted from the net profits calculation.  Even so, the Hammans have failed to meet their initial burden.

A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an absence of a genuine issue of material fact." *Lohan v. Morgan Stanley DW, Inc*., 652 F. Supp. 2d 812, 823 (S.D. Tex. 2009) (citations omitted).  If the moving party fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response.  *Id*.  Once the movant meets its burden, however, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial.  *Id*.  To do so the nonmovant must go beyond the pleadings and by its own affidavits or by deposition, answer to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial.  *Id*.  Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence.  *Id*.  Nor are pleadings summary judgment evidence.  *Id*.  Nor is the Court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment.  *Id*.

All reasonable inferences must be drawn in favor of the nonmoving party.  Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence but may identify a genuine issue of material fact extant in the summary judgment evidence produced by the moving party.  *Id*.  The nonmoving party may also identify evidentiary

documents already in the record that establish specific facts showing the existence of a genuine issue. *Id*. In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form. *Id*.

The Hammans do not set forth what items were charged as expenses in determining net profits, other than providing for the exclusion of legal fees. (ECF Nos. 48-56; 48-57). Instead, the Hammans provide charts along with e-mail correspondence between counsel in the previous Related Litigation[24] that purport to show production from March 2000 to December 2017. (ECF Nos. 48-55; 48-56; 48-57). From these documents, which make up Exhibits D and E, the Hammans created Exhibit F, which deducts legal fees from production to calculate their net profits interest. (ECF No. 48-57) (noting a column labeled "EXCLUDING: Legal Fees"). However, in light of the fact that Gill's affidavit is not based on personal knowledge, the Court will not consider Exhibits D, E, or F in support of the Hammans' damages claim.

Moreover, the Court is wary of accepting counsel's "admission" or concession to damages in a previous litigation, as true and binding statements in this proceeding. "Judicial admissions must be distinguished from ordinary evidentiary admissions." HON. BARRY RUSSELL, BANKR. EVID. MANUAL § 801:22 (2019) (citations omitted). "Judicial admissions are formal, deliberate declarations which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." *Id*. (citations omitted). Judicial admissions are also defined as "formal admissions in pleadings, which have the effect of withdrawing a fact from issue and dispensing wholly with need for proof of that fact." *Id*. They are conclusively binding on the party who made them. *Id*.

---

[24] In the email correspondence between Lee S. Gill and Gary E. Ellison, which the Court presumes is counsel for the Lyle Defendants in the Related Litigation, Mr. Ellison concedes that the numbers in Exhibit E are correct. (ECF No. 48-55 at 1).

"Included within this category are admissions in the pleadings in the proceeding, stipulations and admissions pursuant to request to admit." *Id*. Statements of counsel may also constitute judicial admissions.

On the other hand, ordinary evidentiary admissions, may be controverted or explained by the party. *Id*.; *see Martinez v. Bally's Louisiana, Inc*., 244 F.3d 474, 476 (5th Cir. 2001) ("[A] judicial admission is a 'formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making [it],' because for a statement of counsel to qualify as a judicial admission 'it must be made intentionally as a waiver, releasing the opponent from a proof of fact. An evidentiary admission is a statement of assertion or concession made for some independent purpose.'"). "Within this category fall pleadings in another proceeding, superseded or withdrawn pleadings in the same proceeding, answers to interrogatories, as well as other statements admissible under Rule 801(d)(2)." HON. BARRY RUSSELL, BANKR. EVID. MANUAL § 801:22 (2019) (citations omitted). Notably, "[s]tatements made in [a] prior separate lawsuit cannot be judicial admission in [a] present lawsuit." *Id*.

Here, Lyle's purported concession to the amount of damages does not constitute a judicial admission because the email correspondence which contained the purported admission was part of a prior, separate lawsuit. Counsel's statement that the numbers are "accurate" was not made in this proceeding "intentionally as a waiver, releasing the [Hammans] from a proof of fact." *Martinez*, 244 F.3d at 476. Therefore, Lyle's concession or purported admission that the amounts shown in Exhibits D and E are "accurate" is not "conclusively binding" on Lyle in this proceeding. Moreover, the Hammans have not demonstrated that judicial estoppel applies. Accordingly, the Court will not consider Exhibits D, E, and F as summary judgment evidence as to the Hammans' damages.

To determine what should be deducted from the proceeds of production in order calculate the Hammans' net profits interest in the Hogg-Japhet Lease, the parties must look to the agreement itself:

> A net profits interest is . . . an interest in minerals in place that is defined as share of gross production measured by net profits from operation of the property.  Like the overriding royalty, a net profits interest is created out of the working interest and has a similar duration.  Unlike the overriding royalty, *the income accruing to the net profits interest is reduced by specified development and operating costs, but the interest bears such expenses only to the extent of its share of the income,* and is not required to pay out, advance or become liable for such cost, as is the working interest. . . .   Until any accumulated net losses are offset by future net profits from operation of the property, the owner of the net profits interest will receive no income.  The interest is regarded as a nonoperating interest in the minerals in place similar to an overriding royalty.

> A share of gross production from a property, measured by net profits from operation of the property.  It is carved out of the working interest.  A net profits interest is an economic interest in oil and gas and is accordingly entitled to the depletion allowance.

> A net profit agreement is a contract providing that the beneficiary thereof shall receive a stated percentage of the net profits from the operation of the oil and gas property to which the contract refers.  *As part of the contract, an accounting arrangement is described in detail which informs the reader of those expenditures deemed expenses for purposes of subtraction from production revenue to arrive at "net profit."*

*Burns v. Comm'r of Internal Revenue*, 78 T.C. 185, 209 (1982) (emphasis added) (citations omitted); *see also In re Breitburn Energy Partners L.P.*, 571 B.R. 59, 65 (Bankr. S.D.N.Y. 2017) ("[A] net profits interest is a share of gross production under which the operator pays all costs of exploration and development and, after satisfying such costs from the proceeds of production, shares the profits *on an agreed basis* with the owner of the net profits interest." (quoting 2 WILLIAMS AND MEYERS, OIL AND GAS LAW § 424.1 at 439 (1981) (emphasis added)).

Here, the 1913 Agreement, from which the Hammans derive their 5.00% net profits interest provides:

> It is further agreed and understood that if the second party should discover and produce oil, gas, or other minerals in and under lands covered by the leases assigned herein during the life of such leases then the said second parties agree, obligates and binds itself, its successors and assigns to carry the . . . one eighth (1/8) of the net proceeds from the sale of the products so produced from said lands. . . . during the existence of said leases . . . *after first deducting all royalties that may be due [to] the original lessors or other under said leases and all expenses of every character growing out of the ownership and operation of said leases, including rentals on said leases, drilling of wells, use of machinery, etc., and caring for and marketing the product from said premises*. One [e]ighth of all expenses growing out of the ownership or operation of said leases . . . shall be charged to [the Hammans] . . . .

(ECF No. 18-4 at 6) (emphasis added).  Thus, in accordance with the provisions of the 1913 Agreement, the working interest owner was entitled to deduct: (i) any royalties due to the original lessors; and (ii) any expenses arising out of the ownership and operation of the property. The 1913 Agreement makes no mention of attorney's fees.

The Hammans have not met their evidentiary burden.  The Hammans have not set forth "what items should or will be charged as expenses or taken into consideration in determining profits under" the agreements that create the working interests in the Lyle Defendants and which preserve the Hammans' 5.00% net profits interest in the Hogg-Japhet Lease.  *Nola Spice Designs, L.L.C., v. Haydel Enter., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) ("The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.").

Accordingly, summary judgment as to damages is denied.

### III.    Attorney's Fees & Pre-Judgment Interest

In light of the Court's ruling denying summary judgment as to damages, consideration of this claim will be abated until a hearing is held on the Hammans' damages claim.

### Conclusion

The Court will issue an order consistent with this Memorandum Opinion.

SIGNED **February 20, 2020.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE