United States Bankruptcy Court
Southern District of Texas
**ENTERED**
October 05, 2021
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 16-34850** |
| **HOUSTON BLUEBONNET, L.L.C.,** | § | |
| | § | **CHAPTER 11** |
| Debtor. | § | |
| | § | |
| **HENRY R. HAMMAN,** *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 16-3251** |
| | § | |
| **KENNETH R. LYLE,** *et al.*, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION</u>

Henry Hamman, along with other members his of family, seek unpaid proceeds from a net proceeds interest (NPI) reserved in an oil and gas lease.  Defendants own a working interest in the lease burdened by the Hammans' NPI.[1]  The existence of the Hammans' NPI and the Hammans' corresponding right to NPI proceeds are well established at this point (though Defendants still dispute this *fact*).  The remainder of the parties' dispute concerns the proper calculation of damages arising from Defendants' nonpayment of the Hammans' NPI.  Specifically, the Hammans and Defendants disagree over whether Defendants' attorneys' fees can be deducted from the Hammans' NPI proceeds as expenses of lease ownership or operation.

---

[1] The Hamman family members party to this action are Henry Hamman, The George and Mary Josephine Hamman Foundation, Laura Hamman Fain, and Elizabeth Hamman Oliver.  (ECF No. 74 at 1 n.1).  Defendants are successors to Humble Oil & Refining Company, the former operator of the lease from which the Hammans' NPI is derived.  (ECF No. 74 at 1–2).  Defendants include: Jennie K. Lyle Bierscheid, executrix of Kenneth Lyle's estate; Lyle Engineering Company; Lukin T. Gilliland; Houston Bluebonnet, LLC, Debtor in the main bankruptcy case; E&H, LP; American Universal Investment, Co.; Esther Suckle, Trustee of the Suckle 1999 Living Trust; and CG Enterprises, Inc.  (ECF No. 74 at 1 n.2, 33).

Under the agreement that defines the Hammans' NPI, Defendants' attorneys' fees are not expenses of ownership or operation that can be deducted from the Hammans' NPI proceeds. The Hammans are entitled to unpaid NPI amounts. The Hammans are also entitled to attorneys' fees and prejudgment interest.

## BACKGROUND

The Hammans derived their NPI from an oil and gas lease granted over 100 years ago. (ECF No. 74 at 3–4). The Hammans' ancestors entered the lease in June 1913 and, by October 1913, had conveyed the lease to Producers Oil Company. (ECF No. 74 at 3–4). It was this conveyance in October 1913 (the "1913 Assignment") that created the Hammans' NPI. (ECF No. 74 at 4).[2] Only a portion of the original NPI is at issue here. Specifically, the Hammans' 2/5 interest in a 1/8 net proceeds interest (or 5.00%) reserved in a specific 20 acres originally covered by the Hogg Lease. (ECF No. 74 at 4–5).[3] Through another series of conveyances, Defendants succeeded to the working interest once held by Producers Oil, out of which the Hammans' NPI was carved. (ECF No. 74 at 7–8).

### *Procedural History*

For years, neither Defendants nor their predecessors paid the Hammans anything. And the Hammans never demanded payment. On November 25, 2013, the Hammans filed suit in Texas state court seeking payment of unpaid NPI proceeds from Defendants. (ECF No. 74 at 8). That suit eventually became this adversary proceeding after Houston Bluebonnet filed for bankruptcy in 2016. (ECF No. 74 at 8).

---

[2] The Court's two prior memorandum opinions provide an extensive background on how the June 1913 lease (the "Hogg Lease") and its subsequent assignment catalyzed the parties' dispute here. (*See* ECF Nos. 27, 74).

[3] The lease with respect to this specific 20 acres came to be known as the "Hogg-Japhet Lease." (ECF No. 74 at 6).

Once in bankruptcy court, the parties exchanged multiple rounds of summary judgment motions. In their requests for summary judgment, the Hammans argued that they maintained their NPI notwithstanding multiple subsequent assignments of the burdened lease. (ECF Nos. 27 at 7–8; 74 at 10). Defendants argued in opposition that the Hammans' 1920 Agreement with Humble (Defendants' predecessor) extinguished the Hammans' NPI. (ECF No. 27 at 7). Alternatively, Defendants contended that if the 1920 Agreement did not extinguish the NPI, the Hammans' claims for payment were barred by certain affirmative defenses. (ECF No. 74 at 2–3).[4]

In resolving the parties' summary judgment motions, the Court issued two Memorandum Opinions. (*See* ECF Nos. 27, 74). In its 2017 Memorandum Opinion, the Court found that the Hammans' NPI survived the 1920 Agreement with Humble. (ECF No. 27 at 9). In its 2020 Memorandum Opinion, the Court determined that Defendants were still liable to pay the Hammans' NPI, but found that genuine issues of material fact existed as to the proper amount damages due to the Hammans. (ECF No. 74 at 31–32, 42). The Court did not decide whether the Hammans were entitled to prejudgment interest or attorneys' fees. (ECF No. 74 at 42).

### *This Dispute*

The parties' dispute now centers on three issues: (1) the amount of damages to which the Hammans are entitled; (2) whether the Hammans may recover attorneys' fees; and (3) whether the Hammans are entitled to prejudgment interest. (ECF No. 119 at 1). Defendants also allege that the Court has yet to rule on certain of Defendants' affirmative defenses. (ECF No. 126 at 15:12–20). To resolve these issues, the Court allowed additional briefing and set the matter for an evidentiary hearing. (ECF No. 126 at 15:12–16:1).

---

[4] Defendants asserted the following affirmative defenses: (1) statute of limitations; (2) waiver and estoppel; (3) accord and satisfaction; (4) no personal liability to pay the NPI; and (5) res judicata and collateral estoppel by operation of *Sheffield v. Hogg*, 77 S.W.2d 1021 (Tex. 1934). (ECF No. 74 at 2; *see also* ECF No. 50 at 4, 6–10).

The NPI and The Agreements

The parties' marquee dispute is their disagreement over how the Hammans' NPI is to be calculated. At the outset, Defendants maintain that the Court has yet to dispose of Defendants' claim that the NPI was extinguished or that it does not bind Defendants. (ECF No. 131 at 4–8). Defendants base this position on their argument that the Court has yet to rule on three of Defendants' affirmative defenses: (1) waiver; (2) "estoppel;" and (3) no personal liability. (*See* ECF No. 126 at 15:12–20).

Notwithstanding Defendants' erroneous contention regarding their affirmative defenses, the Hammans and Defendants agreed on the amount of proceeds, as well as the vast majority of expenses deductible from those proceeds, generated by the Hogg-Japhet leasehold. Yet Defendants maintain that the attorneys' fees incurred in this litigation and another related state court proceeding, the Japhet Litigation,[5] are expenses chargeable against the proceeds from which the Hammans' NPI is paid. (ECF No. 131 at 3–4). Defendants also argue that a portion of the proceeds the Hammans seek to recover must be prorated. (ECF No. 131 at 8). Because the Hammans filed suit on November 25, 2013, Defendants contend that the Hammans can only recover unpaid proceeds dating back to November 25, 2009, rather than unpaid proceeds for all of November. (*See* ECF No. 133 at 3).

The parties' disagreement over the deductibility of Defendants' attorneys' fees stems from the parties' disagreement over the document controlling the NPI's calculation—the 1913 Assignment by which the Hammans reserved their NPI. Though Defendants contend that the 1913 Assignment does not control the calculation of the Hammans' NPI, Defendants argue that if it does

---

[5] In the Japhet Litigation, the Japhet Family sought to recover unpaid net profits from an NPI that Dan A. Japhet reserved in the Hogg-Japhet Lease when it was assigned to Humble. *Bierscheid v. JPMorgan Chase Bank*, 606 S.W.3d 493, 501 (Tex. App.—Houston [1st Dist.] 2020, pet. denied). Many of the Defendants party to this action were also sued by the Japhets. *Id.* at 506.

control, the 1913 Assignment contemplated the deduction of Defendants' attorneys' fees from the proceeds due to the Hammans. The 1913 Assignment provides:

> [I]f the second party [(*i.e.,* Producers Oil)] should discover and produce oil, gas, or other minerals in and under lands covered by the leases assigned herein during the life of such leases then the said second party agrees, obligates and binds itself, its successors and assigns to carry the [Hammans' interest[6]] for one eighth (1/8) of the net proceeds from the sale of the products so produced from said lands. . . . *[The Hammans] are to have one eighth (1/8) of the Proceeds from the sale of oil, gas, or other minerals produced* on said lands during the existence of said leases in the proportion above stated, *after first deducting all royalties that may be due the original lessors or others under said leases and all expenses of every character growing out of the ownership and operation of said leases, including rentals on said leases, drilling of wells, use of machinery, etc., and caring for and marketing the product from said premises.* One Eighth of all expenses growing out of the ownership or operation of said leases, as above set out, shall be charged to the [Hammans].

(ECF No. 19-3 at 6 (emphasis added)).

Defendants take the position that the 1913 Assignment is irrelevant because the 1920 Agreement between the Hammans' predecessors and Humble Oil extinguished the Hammans' NPI. However, the 1920 Agreement settled an NPI accounting dispute between the Hammans' predecessors and Humble Oil. (ECF Nos. 74 at 7; 19-1 at 2). Though intended to settle an accounting dispute, the 1920 Agreement makes no mention of the chargeability of attorneys' fees against the Hammans' NPI. The Agreement did, however, explicitly preserve the Hammans' rights and obligations under the 1913 Assignment to Producers Oil, Defendants' predecessor. (ECF No. 19-1 at 6; *see also* ECF No. 74 at 6–7).

Defendants argue that if the NPI did survive the 1920 Agreement, the 1972 Operating Agreement—to which the Hammans were not parties—controls the calculation of expenses

---

[6] Along with the Hammans' predecessors, J.C. McKallip and F.N. Bullock shared in the 1/8 net proceeds interest. (*See* ECF Nos. 19-3 at 6; 74 at 4). Eventually the Hammans' predecessors came to hold an interest in 2/5 of the 1/8 net proceeds interest described in the 1913 Agreement. (ECF No. 74 at 4).

deductible from the Hammans' NPI.  (ECF No. No. 147 at 2).  With respect to expenses, the 1972

Operating Agreement provides:

> All costs, expenses and liabilities accruing or resulting from the operation of the Joint Property[7] pursuant to this Agreement shall be determined, shared and paid by the Joint Owners in the proportions set out in Exhibit A under the heading 'Interests of Parties' . . . . *All such costs and expenses and related matters and the method of accounting shall be in accordance with the schedule designated "Accounting Procedure" attached hereto as Exhibit B and made a part hereof.* . . .

(ECF No. 102-37 at 1–2 (emphasis added)).  Exhibit B to the 1972 Operating Agreement defined

the accounting procedures for calculating expenses to be paid by the "Joint Owners" for "Joint

Operations."  (*See* ECF 102-37 at 34–40).  Exhibit B identifies certain "Legal Expense[s]" that are

to be borne by the Joint Owners:

> All costs and expenses of handling, investigating, and settling litigation or claims *arising by reason of the Joint Operations or necessary to protect or recover the Joint Property*, including, but not limited to, attorney's fees, court costs, cost of investigation or procuring evidence and amounts paid in settlement or satisfaction of any such litigation or claims; provided, . . . *no charge shall be made for the fees and expenses of outside attorneys unless the employment of such attorneys is agreed to by Operator and Non-Operators.*[8]

(ECF No. 102-37 at 35).  Defendants contend they are "Non-Operators" under the agreement and

agreed to the employment of their counsel.  (ECF No. 131 at 3).  Hence, Defendants argue, their

attorneys' fees related to this litigation and the Japhet Litigation qualify as "Legal Expenses" under

the 1972 Operating Agreement.  (ECF No. 131 at 3).

---

[7] A defined term in the 1972 Operating Agreement which encompassed the Hogg-Japhet leasehold.  (ECF No. 102-37 at 1–2, 25–26).

[8] Under the Operating Agreement, a "Non-Operator" was any party other than a party designated as an "Operator" under the Agreement.  (ECF No. 102-37 at 34).  The "Non-Operators'" approval could be achieved by the "agreement or approval of a majority in interest of the Non-Operators."  (ECF No. 102-37 at 34).

Attorneys' Fees and Prejudgment Interest

Defendants contest the Hammans' entitlement to attorneys' fees and prejudgment interest on the grounds that the Hammans are not statutorily entitled to fees or interest.  (ECF No. 131 at 8–9).  Defendants maintain that the provisions of the Texas Natural Resources Code authorizing awards of attorneys' fees and prejudgment interest do not apply to the Hammans.  (ECF No. 131 at 8–9).  The relevant provisions' asserted inapplicability results from the fact that the Hammans' NPI predates the provisions' enactment.  (ECF No. 131 at 8–9).  Alternatively, Defendants argue that the provisions do not apply because the Hammans are not "payees" nor are the 1913 Assignment and 1920 Agreement "division orders" under the Natural Resources Code.  (ECF No. 131 at 8–9).

Following the completion of the parties' additional briefing and the evidentiary hearing, the Court took the matter under advisement.

## JURISDICTION

The District Court's jurisdiction over this proceeding originated under 28 U.S.C. § 1334.  This proceeding was referred to the Bankruptcy Court under General Order 2012-6 consistent with 28 U.S.C. § 157(a).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O), as its outcome will affect the administration of the estate.

## DISCUSSION

The Hammans own an NPI that is to be paid out of Defendants' working interest in the Hogg-Japhet Lease.   The Hammans and Defendants disagree about the proper method of calculating the NPI.  This accounting disagreement stems from the parties' deeper divide over the effect of the instrument establishing the Hammans' NPI.  Defendants also dispute the Hammans' statutory entitlement to attorneys' fees and prejudgment interest.

The 1913 Assignment obligates Defendants to pay the Hammans' NPI, but the Assignment does not allow Defendants to charge their legal expenses against the Hammans' NPI proceeds. The Hammans are entitled to recover unpaid NPI proceeds from Defendants, as well as attorneys' fees and prejudgment interest.

## I.   THE PROPER CALCULATION OF THE HAMMANS' NPI

Defendants want the Hammans, via the Hammans' NPI, to bear legal costs Defendants incurred during this litigation and the Japhet Litigation.[9]   Yet the 1913 Assignment forecloses Defendants' attempt to impose their legal expenses on the Hammans.  Defendants' legal costs and fees are not expenses "growing out of the ownership and operation" of the Hogg-Japhet leasehold.

### A.   The 1972 Operating Agreement's Effect on the Hammans' NPI

Defendants rely on the 1972 Operating Agreement to assert that their attorneys' fees are chargeable against the Hammans' NPI.  The Operating Agreement unambiguously includes "legal expense[s]" as "direct charge[s]" arising from the operation of the Hogg-Japhet leasehold. Defendants say this provision establishes Defendants' right to charge their legal fees against the Hammans' NPI as operating expenses.

As an initial matter, the Hammans were not parties to the 1972 Operating Agreement. Generally, a contract cannot be enforced against non-parties.  *Rapid Settlements, Ltd. v. Green*, 294 S.W.3d 701, 706 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)).  There are, however, circumstances in which a non-signatory may be bound by other parties' contractual agreements.  *See In re Kellogg Brown &*

---

[9] In the Japhet Litigation, Defendants disputed the Japhet family's assertion of a net profits interest carved out of Defendants' working interest, which the Japhets argued Defendants failed to pay.  *See Bierscheid*, 606 S.W.3d at 506 ("The Japhets alleged that they were the heirs and successors-in-interest to Dan A. Japhet and, as such, were the current owners of 'an undivided 52/60' of the '1/4 net profits carried working interest' that Dan A. Japhet reserved under the 1919 Assignment of the Hogg-Japhet Lease.").  Like their litigation expenses related to this case, Defendants cast their Japhet Litigation expenses as expenses of ownership or operation that the Hammans must bear under the terms of the 1972 Operating Agreement or the 1913 Assignment.

*Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005) (recognizing theories by which a contract can be enforced against a non-signatory).  As such, unless Defendants establish that the 1972 Operating Agreement is enforceable against the Hammans as non-signatories, the Operating Agreement has no bearing on the NPI's calculation.  *See CNOOC Se. Asia, Ltd. V. Paladin Res. Ltd.,* 222 S.W.3d 889, 894–95 (Tex. App.—Dallas 2007, pet. denied) (citing *Tri-State Bldg. Specialties, Inc. v. NCI Bldg. Sys., L.P.*, 184 S.W.3d 242, 250–52 (Tex. App.—Houston [1st Dist.] 2005, no pet.)) (holding that the party seeking to enforce a contract against a non-signatory bears the burden of establishing the contract's effect on the non-signatory).

Defendants advance no theory and offer no evidence establishing the 1972 Operating Agreement's binding effect on the Hammans.  Under the Operating Agreement, Defendants' predecessors agreed to bear their share of "costs, expenses and liabilities accruing and resulting from the operation" of the Lease burdened by the Hammans' NPI.  (ECF No. 102-37 at 1).  Of course, Defendants' predecessors were free to obligate themselves to bear whatever portion of operating costs the predecessors viewed as economically viable in relation to the value of the predecessors' working interest.  But Defendants cannot force that obligation on the Hammans in the absence of the Hammans' assent.  *See Rapid Settlements*, 294 S.W.3d at 706.[10]

Defendants attempt to argue that the Hammans have benefitted from the Operating Agreement insofar as the Operating Agreement generated production proceeds.  This conferral of benefits, Defendants argue, makes the Operating Agreement enforceable against the Hammans.

---

[10] Agreements may bind non-signatories under an agency theory of contract enforcement.  *CNOOC*, 222 S.W.3d at 899 (citing *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 549 (Tex. App.—Houston [14th Dist.] 2003, no pet.)).  Under an agency theory, Defendants could enforce the 1972 Operating Agreement against the Hammans if the Hammans granted Defendants' predecessors authority to bind the Hammans to such agreements.  *See id.* (explaining the ways in which a party may create an agency relationship with another party such that the other party acts as an agent of the initiating party).  Crucial to this grant of such authority is the principal's (*i.e.,* the Hammans') ability to control the agent's (*i.e.,* Defendants' predecessors') actions.  *Id.*  There is no evidence that suggests such an agency relationship existed between the Hammans and Defendants or their predecessors.

Non-signatories (or "third-parties") may be bound by an agreement from which the non-signatories directly benefit. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011). But to bind a non-signatory, the signatories must "clear[ly] and express[ly]" demonstrate, in the agreement, their intent to benefit a non-signatory. *Id.* Nothing in the Operating Agreement evidences Defendants' predecessors', or any other party's, intent to enter into the Operating Agreement for the Hammans' direct benefit. *See id.* at 426 ("[I]n the absence of a clear and unequivocal expression of the contracting parties' intent to directly benefit a third party, courts will not confer third-party beneficiary status by implication."). Indeed, the Operating Agreement speaks of the "parties['] desire to enter into an agreement for the development, operation and management" of the leases covered by the Operating Agreement. (ECF No. 102-37 at 1). The Agreement does not reference a desire to generate production proceeds for the benefit of burdening-interest owners. The Hammans' receipt of incidental benefits from the production of minerals under the Operating Agreement does not obligate the Hammans to the Agreement's terms. *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999).

Because the 1972 Operating Agreement does not bind the Hammans, it does not affect the calculation of the Hammans' NPI.[11]

## B.     The 1913 Assignment's Effect on the Hammans' NPI

The proper calculation of the Hammans' NPI is dictated by the 1913 Assignment. *See Shelton v. Exxon Corp.*, 921 F.2d 595, 599 (5th Cir. 1991) (citing *Texas Oil & Gas Corp. v. Vela*, 429 S.W.2d 866, 970 (Tex. 1968)) ("The lease defines the royalty obligation."); *see also Devon Energy Prod. Co., L.P. v. Sheppard*, 13-19-00036-CV, 2020 WL 6164467, at *6 (Tex. App.—

---

[11] Furthermore, the 1972 Agreement does not purport to alter the procedure for calculating the Hammans' NPI set out in the 1913 Assignment—the instrument that created the Hammans' NPI. Instead, it simply creates a Joint Account proportionally funded by the parties to the Operating Agreement and out of which the expenses of operating the leases covered by the Operating Agreement were to be paid. (ECF No. 102-37 at 1–3).

Corpus Christi Oct. 22, 2020, pet. filed) (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 122 (Tex. 1996)) (noting that parties may alter general royalty accounting rules by the terms of the lease creating the royalty interest).

Like all oil and gas instruments, the 1913 Assignment must be interpreted like a contract. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 210 (Tex. 2011) (quoting *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005)) ("An oil and gas lease is a contract, and its terms are interpreted as such."). And, as with any dispute over contractual interpretation, the judicial aim is to determine parties' intent in entering the contract, and to enforce that intent. *Id.* (quoting *Tittizer*, 171 S.W.3d at 860). This enforcement is bounded by a requirement that the agreement be construed in a "utilitarian" manner, consistent with the "business activity sought to be served," avoiding an "unreasonable, inequitable, and oppressive" construction of the agreement. *Unit Petroleum Co. v. David Pond Well Serv., Inc.*, 439 S.W.3d 389, 395–96 (Tex. App.— Amarillo 2014, pet. denied) (citing *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005)).

The 1913 Assignment evidences the Hammans' predecessors' intent to reserve an interest in 1/8 of the net proceeds "from the sale of the products so produced" by Producers Oil. (ECF No. 19-3 at 6). Producers Oil was not, however, obligated to pass on pure revenue to the Hammans. Instead, Producers Oil would pay the Hammans 1/8 of the proceeds left from the sale of minerals after "deducting all royalties that [were] due the original lessors or others under said leases and *all expenses of every character growing out of the ownership and operation of said leases*." (ECF No. 19-3 at 6 (emphasis added)).

Both parties offer arguments about the meaning of the 1913 Assignment's NPI calculation provision. The Hammans simply argue that the 1913 Assignment does not explicitly authorize the

charging of attorneys' fees or legal expenses against their NPI.  Defendants contend that the "[i]nclusion of attorneys' fees as expenses in the calculation of net profits on the well is supported by case law, *Wagner & Brown Ltd. v Sheppard*, 282 S.W.3d 419, 424-25 (Tex. 2008), the Operating Agreement (D-Ex. 33), the testimony, decades of custom and practice, and common sense."  (ECF No. 146 at 2).  Neither argument offers a sufficient analysis of the 1913 Assignment's plain language.

To support their position, the Hammans point to the list of expenses "growing out of the ownership and operation" supplied by the 1913 Assignment.  The 1913 Assignment expressly "include[s] rentals on said leases, drilling of wells, use of machinery, etc., and caring for and marketing the product from said premises" as expenses of "ownership and operation."  (ECF No. 19-3 at 6).  The Hammans maintain that this list's inclusion—which omits attorneys' fees—demonstrates that the Hammans' predecessors and Producers Oil did not intend for attorneys' fees to be treated as expenses of "ownership and operation."  The Hammans argue that the maxim "the expression of one is the exclusion of others" establishes the correctness of their interpretation. (ECF No. 146 at 3–4).

However, the use of the word "including" to introduce the list of expenses and the use of "etc." within the list indicate that the list is non-exhaustive.  *See Include*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The participle *including* typically indicates a partial list"); *Et Cetera*, *id.* ("And other things. The term usu[ally] indicates additional, unspecified items in a series.").  The 1913 Assignment's plain terms foreclose the Hammans' interpretation because the terms indicate that certain expenses of operation and ownership were contemplated by, but not enumerated in, the Assignment.  *See Unit Petroleum*, 439 S.W.3d at 396 ("[T]he language in a

contract is to be given its plain, ordinary, and generally accepted meanings unless doing so would defeat the parties' intent.").

Yet the unenumerated expenses contemplated by the 1913 Assignment do not necessarily include, as Defendants contend, attorneys' fees incurred disputing the non-payment claims of burdening-interest holders.  Rather, only expenses of "ownership and operation," as the phrase was used in the 1913 Assignment, may be deducted from the Hammans' NPI.  *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018) ("[W]ords . . . [o]ftentimes . . . cannot be assigned a rigid meaning, inherent in themselves.  Rather, *their meaning turns upon use, adaptation and context* as they are employed to fit various and varying situations." (emphasis added)); *Towne v. Eisner*, 245 U.S. 418, 425 (1918) ("A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.").  The question is thus whether attorneys' fees incurred in wrongfully contesting an obligation to pay a burdening interest were considered "expenses . . . growing out of the ownership and operation" of a mineral lease in 1913.

The language of oil and gas is a language of its own.  Many terms and phrases included in mineral leases and related agreements have meanings that originated over a century ago.  The unique, technical aspects of this language play a role in interpreting the 1913 Assignment.  *See Emerald Oil & Gas*, 348 S.W.3d 194, 211 ("It is a well recognized canon of construction that technical words are to be interpreted as usually understood by persons in the business to which they relate, unless there is evidence that the words were used in a different sense.").  As commonly understood, a net profits (or proceeds) interest usually refers to an interest carved out of a working interest and payable from "net production after costs have been satisfied."  2 WILLIAMS & MEYERS, OIL AND GAS LAW § 424 (2020).  Yet the term "costs," as used to define an NPI, does not have a

static definition.  Rather, the document creating the NPI should identify the costs of production chargeable against the NPI.  *Id.*; *accord Devon Energy*, 2020 WL 6164467, at *6 (citing *Warren v. Chesapeake Expl., L.L.C.*, 759 F.3d 413, 416 (5th Cir. 2014)) (recognizing that parties to a mineral lease may use the lease to modify the general rules for calculating royalty interests).

The 1913 Assignment identifies two broad categories of "costs" that are to be deducted from the Hammans' NPI: (1) expenses growing out of the lease's ownership and (2) expenses growing out of the lease's operation.  The 1913 Assignment provides examples of costs that constitute expenses of "ownership and operation" under the Assignment: "[lease] rentals;" the "drilling of wells;" "use of machinery;" and "caring for and marketing the product from said premises."  (ECF No. 19-3 at 6).

### 1.  Expenses of Operation Under the 1913 Assignment

Generally, expenses of "operation" include costs associated with "drilling, completing, and equipping a well; processing, treating, transporting, and marketing the product."  3 KUNTZ, LAW OF OIL AND GAS § 42.2 (2021) ("The extent to which such expenses . . . are borne or shared by the parties will be governed, of course, by their agreement . . . .").  Out of the examples provided by the 1913 Assignment, the only example that does not appear to be an "operation" expense is the cost of lease rentals.  The other three examples fit within the generally accepted meaning of operation expenses.  *See id.*  Moreover, these examples of operation expenses all relate to the process of extracting minerals from the ground and marketing those minerals for sale.  *Cf. Leonard v. Prater*, 36 S.W.2d 216, 219 (Tex. Comm'n App. 1931) (noting that the phrase "expense of 'operating the lease'" refers to "expenses incident to the development of the oil or gas under said land").

It would be contrary to the language of the 1913 Assignment to conclude that the phrase "expenses . . . growing out of . . . operation"—the examples of which relate to taking minerals from the ground to market—was intended to encompass legal expenses incurred wrongfully opposing the non-payment claims of burdening-interest holders. *See In re ReadyOne Indus., Inc.*, 394 S.W.3d 697, 701 (Tex. App.—El Paso 2012, no pet.) (citing *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003)) (recognizing that when general and specific words are grouped together, "the general words are limited by the specific words and will be construed to embrace only objects similar in nature"). Rather, the phrase "expenses of every character growing out of . . . operation," read in harmony with the examples provided, authorizes Defendants to deduct from the Hammans' NPI only those costs relating to the process of extracting minerals for later sale.[12] *See Unit Petroleum*, 439 S.W.3d at 395 ("We consider the entire writing and attempt to harmonize and give effect to all of the contract's provisions."). Legal expenses related to Defendants' participation in this litigation and the Japhet Litigation are not expenses of "operation" under the 1913 Assignment.

### 2. *Expenses of Ownership Under the 1913 Assignment*

Still, the 1913 Assignment implicitly authorized Defendants to deduct from the Hammans' NPI "expenses of every character growing out of the ownership" of the Hogg-Japhet leasehold beyond just "[lease] rentals." Neither side offers any authority illuminating what those unenumerated ownership expenses might include.

---

[12] Certain "legal expenses" may be incurred in "operating" a lease, such as "landman fees, lease bonuses, recording fees, and title opinion expenses." *Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 424–25 (Tex. 2008). However, legal expenses incurred while disputing non-payment claims have nothing to do with extracting minerals from the ground and taking those minerals to market. *See Bierscheid*, 606 S.W.3d at 542 (rejecting the argument that legal fees incurred litigating the validity of a net profits interest were "necessary to oil and gas production"). Defendants' assertion that *Wagner* establishes the *per se* deductibility of attorneys' fees in calculating an NPI is misplaced. *Id.* ("We do not read *Wagner & Brown* as supporting the proposition that legal fees that an operator incurs in the course of conducting litigation is a 'necessary, direct expense of operations' and may be considered a 'working interest expense.'").

Unlike the term "expenses . . . growing out of . . . operation," there is little to no authority assigning a uniform meaning to the phrase *"*expenses . . . growing out of . . . ownership" as it is used in oil and gas leases.  The plain meaning of the words thus guides their interpretation.  As applied to businesses, the word "expense" means the "[b]urden of expenditure; the pecuniary charge, cost, or sacrifice involved in any course of action, mode of living, etc., or requisite for the attainment of any object."  *Expense*, OXFORD ENGLISH DICTIONARY (2d ed. 1989); *see also Expense*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1958) ("[C]ost or money paid out; an aggregate of the necessary expenditures, as in the management of a business.").  "Ownership" is defined as the "legal right of possession; property, proprietorship, dominion."  *Ownership*, OXFORD ENGLISH DICTIONARY (2d ed. 1989); *see also Ownership*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1958) ("[L]awful claim or title; property; proprietorship; dominion."); *Ownership*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The bundle of rights allowing one to use, manage, and enjoy property, including the right to convey it to others.").  Finally, "grow," when used in conjunction with a preposition (*i.e.,* "out of"), means "[t]o become ineradicably fixed into, vitally or indissolubly united to ([w]ith) something, as by process of growth."  *Grow*, OXFORD ENGLISH DICTIONARY (2d ed. 1989); *see also Grow Out Of*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1958) ("a. To issue from . . . ; to result from.").

Read naturally, the phrase "expenses of every character . . . growing out of . . . ownership," as used in the 1913 Assignment, refers to *any costs that are vitally necessary to the ownership and possession* of working interests in the Hogg-Japhet Lease.  *See Pagel v. Pumphrey*, 204 S.W.2d 58, 64 (Tex. Civ. App.—San Antonio 1947, writ ref'd n.r.e.) ("Contracts * * * [*sic*] are to be read and understood according to the natural and obvious import of the language . . . ." (internal

quotation marks omitted)); *see also Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 149 (Tex. 2020) (quoting *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 121 (Tex. 2015)) ("We begin with the most important consideration in interpreting any contract: 'the plain meaning of the agreement's operative language.'").

The example of "[lease] rentals" as an expense of ownership provides helpful context to the ownership expense provision. *See Central Mut. Ins. Co. v. KPE Firstplace Land, LLC*, 271 S.W.3d 454, 459 (Tex. App.—Tyler 2008, no pet.) (citing *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995)) ("To this end, we construe the terms of the contract as a whole and consider all of its terms, not in isolation, but within the context of the contract"). Within the oil and gas industry, "lease rentals" generally refer to payments that a lessee must make to the lessor for the right to delay exploration and production beyond the primary term set out in the mineral lease. *See, e.g., ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 874 (Tex. 2018) ("A delay rental is a periodic payment made by an oil-and-gas lessee to postpone exploration during the primary lease term. The purpose of a delay rental is to ensure that the lessee has no obligation to drill during the primary term by negating any implied obligation to test the premises." (internal citations omitted)); *see also* 8 WILLIAMS & MEYERS, *Rental Covenant, in* OIL AND GAS LAW SCOPE (2020) ("A term which has been employed *to describe a royalty clause providing for a flat sum periodic payment* (rather than a fraction or percentage of production, value or proceeds) for gas or casinghead gas." (emphasis added)). The inclusion of "rentals on said leases" as an example of an ownership expense indicates that the 1913 Assignment contemplated the Hammans' obligation to bear a portion of *expenses vitally necessary for Defendants' to maintain their ownership* beyond the lease's primary term.

Other industry-recognized expenses of ownership (*i.e.,* those vitally necessary to maintaining ownership of a lease) might include *ad valorem* taxes, *see, e.g., Stanolind Oil & Gas Co. v. Terrell*, 183 S.W.2d 743, 745 (Tex. Civ. App.—Galveston 1944, writ ref'd) (recognizing that mineral lessors may seek to impose the burden of *ad valorem* taxes on a mineral lessee), as well as "landman fees, lease bonuses, recording fees, and title opinion expenses," *see, e.g., Wagner*, 282 S.W.3d at 425 (determining that a mineral interest owner was obligated, as a cotenant, to bear expenses incurred by the operator of a unit encompassing the owner's tract of land). Certain "'overhead expenses' (including administration, supervision, office services, and warehousing)" might also fall under the description of expenses of ownership. *See id.*

A common thread ties these costs together: the failure to pay the costs could impair the lessee's ownership or possessory interest in the lease. For example, the lessee's failure to pay a lease rental will likely cause the lease to revert to the lessor, thereby depriving the lessee of its title to the lease. Or should the lessee fail to pay *ad valorem* taxes, the state may acquire a lien on the property, which would encumber lessee's title to the property. Similarly, a working interest holder cannot operate (*i.e.,* exercise dominion over) a lease without incurring at least some overhead expenses. In sum, the lessee's ability to own and possess the lease *necessarily depends* on the payment of these costs of ownership.

Yet the thread that binds these costs of ownership together does not extend to legal costs, such as attorneys' fees, incurred warding off non-payment claims asserted by burdening-interest holders. True, a failure to retain legal counsel in a dispute with an alleged burdening-interest holder, like a failure to pay another expense of ownership, could result in the impairment of lessee's *pecuniary* interest in the lease (*i.e.,* a reduction in profit). And it is the lessee that is uniquely incentivized, by virtue of the lessee's ownership, to protect this pecuniary interest. But

the lessee's pecuniary interest in the lease differs from the lessee's *ownership* interest (*i.e.* the "legal right of possession") in the lease.  And a failure to incur legal expenses in defense of non-payment claims will not impact the lessee's *ownership* interest in the lease.  That is, should the lessee choose not to incur legal expenses to oppose the non-payment claims of burdening-interest holders, the lessee will not be deprived of its "legal right to possession" or "dominion" over the lease.  Viewed from this interest-specific perspective, attorneys' fees, like those Defendants incurred, are only expenses of ownership insofar as the lessee, by virtue of its ownership, is incentivized to incur the attorneys' fees.

Defendants' reading of "expenses . . . growing out of ownership" conflates Defendants' pecuniary interest in the Hogg-Japhet Lease with their ownership interest.  The practical implications of Defendants' conflation bear out the absurdity of Defendants' construction of the 1913 Assignment.  According to Defendants, the Hammans' predecessors agreed, in the same instrument that created the Hammans' NPI, to subsidize, through the NPI itself, Producers Oil's (or its successors') legal opposition to the Hammans' right to receive proceeds under the NPI. Defendants' position is, essentially, that the Hammans' predecessors both reserved an interest in the lease now held by Defendants and, by the same agreement, also agreed to pay for Producers Oil's successors' efforts to challenge that reserved interest.  Moreover, had Defendants succeeded in disputing the NPI's existence, there would be no NPI from which Defendants' legal fees could be deducted.  To read the 1913 Assignment to produce such a result would be absurd.  *See Tetra Tech, Inc. v. NSAA Investments Grp., LLC*, 02-15-00297-CV, 2016 WL 3364876, at *5 (Tex. App.—Fort Worth June 16, 2016, no pet.) (citing *Clark v. Cotten Schmidt, L.L.P.*, 327 S.W.3d 765, 772 (Tex. App.—Fort Worth 2010, no pet.)) ("[C]ontract interpretation should be a utilitarian endeavor *that does not lead to absurd results*." (emphasis added)).

Defendants' reading of the 1913 Assignment also departs from the plain meaning of the words used by the parties' predecessors in the 1913 Assignment. *See Unit Petroleum*, 439 S.W.3d at 396 ("[T]he language in a contract is to be given its plain, ordinary, and generally accepted meanings unless doing so would defeat the parties' intent."). Defendants argue that their Hamman- and Japhet-Litigation-related expenses are expenses that "grow[] out of the[ir] ownership" of the Lease. Yet an expense that "grow[s] out of [Defendants'] ownership" of the Hogg-Japhet Lease must be "ineradicably[13] fixed [to]" or "indissolubly[14] united with" Defendants' obligations as owners of a working interest in the Lease. *See Grow*, OXFORD ENGLISH DICTIONARY (2d ed. 1989).

As owners of working interests, Defendants were not obligated to incur legal expenses disputing the Hammans' and Japhets' non-payment claims.[15] True, Defendants had an incentive to dispute the non-payment claims because the claims threatened Defendants' *pecuniary* interest in the Lease. But the fact that Defendants' ownership created an incentive to incur such legal expenses does not mean the expenses are "indissolubly united with" Defendants' ownership. In fact, the expenses were only incurred because Defendants wrongfully *chose* to dispute the Hammans' and Japhets' asserted interests. Nevertheless, Defendants would have maintained their ownership interest notwithstanding their decision—either to dispute the non-payment claims or to simply pay the Hammans and Japhets their NPI proceeds. Ultimately, this *choice* establishes that Defendants' Hamman- and Japhet-Litigation-related expenses are not "expenses . . . growing out

---

[13] To be "ineradicable" is to be "[i]ncapable of being eradicated or rooted out." *Ineradicable*, OXFORD ENGLISH DICTIONARY (2d ed. 1989).

[14] Something that is "indissoluble" "cannot be separated or disunited, as an element, from the whole." *Indissoluble*, OXFORD ENGLISH DICTIONARY (2d ed. 1989) ("1. That cannot be dissolved into its elements or particles; incapable of being decomposed or disintegrated; that cannot be destroyed, put an end to, or abolished; indestructible.").

[15] Like the Hamman Litigation expenses, Defendants only incurred the Japhet Litigation expenses after deciding to oppose the Japhets' attempt to recover unpaid proceeds from an NPI reserved in the lease interest now held by Defendants. *See Bierscheid*, 606 S.W.3d at 503, 506.

of [Defendants'] ownership" of the Lease.[16]  If the expenses grew out of Defendants' ownership (*i.e.,* were "indissolubly united with" Defendants' ownership), Defendants' choice would necessarily affect their ownership interest.

Defendants' reading is not vindicated by the 1913 Assignment's broad language requiring the Hammans to bear a portion of "*all* expenses of *every character*."  (ECF No. 19-3 at 6 (emphasis added)).   The Hammans were not required to bear "all expenses of every character" that Defendants incurred.  Instead, the 1913 Assignment limited the Hammans' responsibility to bear only those expenses "growing out of [Defendants'] ownership."  (ECF No. 19-3 at 6).  Defendants' legal expenses do not qualify as one of the types of "expenses of every character" that the 1913 Assignment required the Hammans to bear.  Defendants' reading thus departs from the 1913 Assignment's plain meaning.  *See Unit Petroleum*, 439 S.W.3d at 396.

---

[16] Modern authority supports a reading of the 1913 Assignment that would preclude Defendants from forcing the Hammans to bear Defendants' legal costs associated with the parties' dispute.  *Cf. Emerald Oil & Gas*, 348 S.W.3d at 211 ("It is a well recognized canon of construction that technical words are to be interpreted as usually understood by persons in the business to which they relate . . . .").  In *Aminoil USA, Inc. v. OKC Corp.*, the Eastern District of Louisiana determined that a lessee's legal expenses incurred disputing an NPI owner's non-payment claims were not, under a farmout agreement, costs of ownership that could be deducted from the net profits account.  629 F. Supp. 647, 649, 654 (E.D. La. 1986).  The farmout agreement provided that the lessee could charge against the net profits account: "[a]n amount equal *to the expenses of litigation*, liens, judgments and liquidated liabilities and claims *incurred and paid by OKC on account of its ownership interest in the subject lease*, or incident to the development, exploration, operation, or maintenance thereof."  *Id.* at 652–53 (brackets in original and emphasis added).  Two accounting experts, with extensive experience in the oil and gas industry dating back to the 1940s, testified that this language, "under accepted accounting practices in the oil and gas industry, *never includes legal expenses related to a dispute between the contracting parties*."  *Id.* at 653 (emphasis added).  Instead, as one of the experts concluded, the language encompassed "legal fees incurred with respect to protecting the title of the property" or legal expenses related to tort liability arising from the lease's operation.  *Id.* (internal quotation marks omitted).  The second expert echoed the first's testimony, concluding that the provision covered legal expenses incurred "in connection with the defense of [the lessee's] title to the property. . . *as it relates to outsiders.*"  *Id.* (internal quotation marks omitted and emphasis added).  The court accepted both experts' testimony as industry-specific explanations of the farmout agreement's net-profits accounting provision.  *Id.* at 654.  *Aminoil's* industry-specific interpretation of accounting language, which is similar to the 1913 Assignment's language, foreclosed the lessee from burdening the NPI owner's NPI with same kind of legal expenses Defendants here seek to impose on the Hammans.  *Compare id.* at 652–53 *with* (ECF No. 19-3 at 6).

The Eastern District of Louisiana decided *Aminoil* under Louisiana law.  *See* 629 F. Supp. at 654.  However, the provisions of Louisiana law on which the Eastern District relied are substantially analogous to principals of contract interpretation under Texas law.  *Compare id.* (citing LA. CODE CIV. ANN. art. 2047 (1985), *with Emerald Oil*, 348 S.W.3d at 211, *and Unit Petroleum*, 439 S.W.3d at 396.

Furthermore, adopting Defendants' reading of the 1913 Assignment would produce an inequitable result. *See L & F Distribs.*, 165 S.W.3d at 312 (holding that contract should not be construed "inequitabl[y]"). Under their *carte blanche* reading of the 1913 Assignment, Defendants could willfully fail to pay burdening-interest holders (*i.e.,* the Hammans or Japhets), then defend that failure in court, passing the litigation costs on to the Hammans as expenses of lease ownership. Essentially, Defendants could engage in fishing expeditions to strip away burdens on Defendants' interest while being assured the Hammans would foot part of the bill.[17]  Surely, this is not what the Hammans' and Defendants' predecessors intended when authorizing the deduction of "expenses of . . . ownership" from the Hammans' NPI. *See Emerald Oil & Gas*, 348 S.W.3d at 210.

The 1913 Assignment dictates the "expenses of . . . ownership and operation" that the Hammans must bear through their NPI.  Under the 1913 Assignment's plain language, the Hammans are only responsible for expense "growing out of [Defendants'] ownership and operation" of the Hogg-Japhet Lease.  Defendants' Hamman- and Japhet-Litigation-related expenses do not grow out of Defendants' ownership or operation of the Hogg-Japhet Lease. Hence, the 1913 Assignment does not require the Hammans to bear Defendants' legal expenses.

### C.    Damages due to The Hammans

The Hammans are entitled to damages amounting to the NPI proceeds Defendants have failed to pay the Hammans since November 25, 2009.[18]  These damages arise from the Hammans'

---

[17] However, the Hammans would likely have been incentivized to enter a separate fee-sharing agreement with Defendants during the Japhet Litigation.  A determination that the Japhets' asserted NPI was valid would adversely affect the Hammans' pecuniary interest in the Hogg-Japhet Lease, as the Hammans' NPI was also burdened by royalty payments due under the Hogg (later the Hogg-Japhet) Lease.  (*See* ECF No. 19-3 at 6).  To prevent their pecuniary interest from being negatively and unnecessarily affected by the Japhet Litigation, the Hammans, had they viewed it as economically viable, may have been willing to share the burden of mounting an opposition to the Japhets' claims.

[18] The Hammans are not entitled to recover unpaid NPI proceeds for the entire month of November 2009 because the Hammans did not initiate this action until November 25, 2013.  (*See* ECF No. 74 at 32).

successful breach of contract claim.  Defendants, as successors to Producers Oil under the 1913 Assignment, were contractually bound to pay the Hammans' NPI.  (*See* ECF No. 74 at 18–29).[19] Defendants breached that obligation.  *Cf. Koopmann*, 547 S.W.3d at 878–79 (recognizing that a royalty owner may assert a breach of contract claim against a lessor that fails to uphold its royalty-payment obligation under a lease).  As a result, Defendants are jointly and severally liable to the Hammans for the unpaid NPI proceeds.  *See InvestIN.com Corp. v. Europa Intern., Ltd.*, 293 S.W.3d 819, 828 (Tex. App.—Dallas 2009, pet. denied) (citing *CTTI Priesmeyer, Inc. v. K & O Ltd. P'ship*, 164 S.W.3d 675, 684 (Tex. App.—Austin 2005, no pet.)) (explaining that "joint and several liability arises in a contract based on" a joint promise to perform certain contractual obligations).  Defendants also have a continuing obligation to pay the Hammans' NPI consistent with the 1913 Assignment.

The parties resolved some of their disagreement over the proper calculation of NPI amounts due to the Hammans.  (*See* ECF Nos. 118 at 1–4; 117-1 at 1–4).  Defendants cannot, however, deduct their Hamman- and Japhet-related legal expenses from the amounts due to the Hammans.  (*See, e.g.,* ECF No. 117-1 at 1–4 (setting out Defendants' legal expenses in columns G, H, and I)).[20]

Defendants' contentions that they are not liable to the Hammans for failing to pay NPI proceeds due to the Hammans are without merit.  The Court's prior Memorandum Opinions

---

[19] The 1913 Assignment provides, specifically, "[i]t is further agreed and understood that if the [working interest owner] should discover and produce oil, gas, or other minerals . . . the [working interest owner] agrees, obligates, and binds itself, its successors and assigns to carry the [Hammans' NPI]."  (ECF No. 19-3 at 6).

[20] "Houston Bluebonnet['s] Expenses" cannot be deducted from the Hammans' NPI proceeds either.  (*See* ECF No. 118 at 4–5).  Defendants concede that these expenses "relate directly to the defense of the claims made against the working interest owners from production and operations of said twenty (20) acres for claims asserted one hundred (100) years after the Settlement Agreement between the real parties-in-interest . . . either set of Plaintiffs, Japhet or Hamman, owning an interest in any portion of the 1913 Hogg lease."  (ECF No. 118 at 5).  Hence, Houston Bluebonnet's Expenses are expenses Defendants incurred disputing the Hammans' and Japhets' non-payment claims.  Such expenses are not "expenses . . . growing out of [Defendants'] ownership or operation" of the Hogg-Japhet Lease.

foreclose Defendants' continued assertion of their affirmative defenses. (ECF No. 108 at 2; *see generally* ECF Nos. 27, 74). The Court's determination of Defendants' continuing liability to the Hammans forecloses Defendants' waiver defense. (ECF No. 74 at 29); *see Tenneco Inc. v. Enter. Products Co.*, 925 S.W.2d 640, 643 (Tex. 1996) ("The affirmative defense of waiver can be asserted against a party who intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right."). The Court foreclosed Defendants' "estoppel" defense by determining that *Sheffield v. Hogg*, 77 S.W.2d 1021, did not bar the Hammans' claims. (*See* ECF No. 74 at 14).[21] Finally, because the Hammans' NPI is a covenant running with the land, Defendants' ownership of an interest burdened by the Hammans' NPI obligates Defendants to pay the Hammans' NPI. (*See* ECF No. 74 at 19–29).

Defendants are jointly and severally liable to the Hammans for the unpaid NPI proceeds, and are bound to pay the Hammans' NPI.

## II.   AWARD OF ATTORNEYS' FEES TO THE HAMMANS

The Hammans seek attorneys' fees under Texas's Civil Practice and Remedies Code, as well as under Texas's Natural Resources Code. (ECF No. 1-17 at 13; *see also* ECF No. 126 at 21:12–21:22). Defendants argue that the Hammans cannot recover attorneys' fees under the Civil Practice and Remedies Code because it does not provide for attorneys' fees in quiet title actions. (ECF No. 147 at 3–4). Defendants also contend that because it was enacted after the consummation of the 1913 Assignment and 1920 Agreement, the Natural Resources Code does not afford the Hammans a right to seek attorneys' fees. (ECF No. 131 at 8–9).

---

[21] If the Defendants' intended to assert an "equitable estoppel" defense, it too is foreclosed by the Court's prior rulings. Defendants presented no evidence and made no argument that the Hammans induced Defendants, to their detriment, into not paying the Hammans' NPI. *See Avary v. Bank of Am., N.A.*, 72 S.W.3d 779, 788 (Tex. App.— Dallas 2002, pet. denied) ("Estoppel arises where, by the fault of one, another is induced to change his or her position for the worse."). The Court's imposition of liability to pay the Hammans' NPI on Defendants settles the inviability of Defendants' "estoppel" defense. (*See* ECF No. 74 at 29).

The Hammans are entitled to attorneys' fees under Civil Practices and Remedies Code section 38.001.   However, the Hammans may not recover attorneys' fees from Houston Bluebonnet and E&H LP.

### A.        Statutory Bases for Attorneys' Fees

The Hammans base their claim for attorneys' fees on three Texas statutes.   First, the Hammans assert they can recover attorneys' fees under Texas Civil Practices and Remedies Code section 37.009.   Section 37.009 provides: "In any [declaratory judgment] proceeding under [chapter 37], the court may award costs and reasonable and necessary attorney's fees as are equitable and just."   TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2021).   Next, the Hammans claim they are entitled to attorneys' fees under section 38.001 of the Civil Practice and Remedies Code.   Section 38.001 provides: "A person may recover attorney's fees from an individual or organization . . . in addition to the amount of a valid claim and costs, if the claim is for: . . . (8) an oral or written contract."   CIV. PRAC. & REM. § 38.001(b)(8).   Finally, the Hammans invoke section 91.406 of Texas's Natural Resources Code as a basis for recovering their attorneys' fees.   That provision provides: "If a suit is filed [under Subchapter J] to collect proceeds and interest . . . the court shall include in any final judgment in favor of the plaintiff an award of: (1) reasonable attorney's fees . . . ."   TEX. NAT. RES. CODE ANN. § 91.406(1) (West 2021).

In their complaint, the Hammans (1) sought a declaratory judgment establishing the validity of the Hammans' NPI, and alleged claims for (2) breach of contract and specific performance and (3) breach of a duty to pay production proceeds under Texas's Natural Resources Code.  (ECF No. 1-17 at 12–13).  The Court granted summary judgment to the Hammans on their breach of contract and specific performance claim, and determined that the Hammans held a valid NPI in Defendants' working interest.  (*See* ECF No. 74 at 29–32).  The Hammans' success on their

state law claims provides a basis for awarding the Hammans attorneys' fees.  *See* Civ. Prac. & Rem. § 38.001(b)(8); *see also Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002) ("State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision.").[22]

Defendants are incorrect in asserting that the Hammans are not entitled to attorneys' fees because their claims amount to a disguised quiet title action.  Generally, attorneys' fees are not available to successful quiet-title plaintiffs.  *Southwest Guar. Tr. Co. v. Hardy Rd. 13.4 Joint Venture*, 981 S.W.2d 951, 957 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (citing *Sadler v. Duvall*, 815 S.W.2d 285, 293–94 (Tex. App.—Texarkana 1991, writ denied)).  Plaintiffs cannot simply rely on the Texas Declaratory Judgment Act to seek attorneys' fees in a pure quiet title action.  *See MBM Fin. Corp. v. Woodlands Operating Co.*, L.P., 292 S.W.3d 660, 669 (Tex. 2009) (explaining that simply repleading a claim, for which attorneys' fees would be unavailable, as a declaratory judgment action will not entitle a plaintiff to seek an attorneys' fee award).

The Hammans' suit against Defendants is not a quiet title action disguised as a declaratory judgment action.  Instead, the Hammans properly pleaded, and succeeded on, their breach of contract claim and received a declaration that their NPI was valid.  The Hammans' successful claim for breach of contract damages entitles them to request attorneys' fees under section 38.001.  *See* Act of May 17, 1985, 69th Leg., R.S., ch. 595, § 1, sec. 38.001, 1985 Tex. Gen. Laws 3242, 3278–79 (amended 2021) (current version at Tex. Civ. Prac. & Rem. Code § 38.001); *see also*

---

[22] The Hammans cannot seek attorneys' fees under section 91.406(1) of the Natural Resources Code.  An award of attorneys' fees under section 91.406 must be predicated on the successful prosecution of a claim under section 91.404.  *See* Nat. Res. § 91.406.  The Hammans neither failed nor succeeded in prosecuting their Natural Resources non-payment claim.  The Hammans proceeded on summary judgment as to Defendants' liability without so much as a cite to section 91.404.  (*See generally* ECF No. 48).  As a result, the Hammans cannot recover attorneys' fees through section 91.406.  *See* Nat. Res. § 91.406; *cf. EOG Res., Inc. v. Wagner & Brown, Ltd.*, 202 S.W.3d 338, 347 (Tex. App.—Corpus Christi 2006, pet. denied) ("Because the parties went forward solely on the declaratory judgment action, fees that may or may not be available under section 91.406 of the natural resources code are not in issue.").

*Bierscheid*, 606 S.W.3d at 547 ("Because the [plaintiffs] obtained an award of damages . . . they are entitled to attorney's fees under . . . section 38.001 . . . ."). The Court cannot, however, award the Hammans attorneys' fees based on their declaratory judgment claim.

Courts sitting in bankruptcy must apply federal procedural law, even when adjudicating removed claims based on state substantive law. *Harmon v. Lighthouse Cap. Funding, Inc. (In re Harmon)*, 10-33789, 2011 WL 1457236, at *4 (Bankr. S.D. Tex. Apr. 14, 2011). Federal procedural rules apply because the removed action is treated like it was originally filed in federal court. *Seal v. Indus. Elec., Inc.*, 362 F.2d 788, 789 (5th Cir. 1966). Both the Texas and Federal Declaratory Judgment Acts are procedural in nature. *Harmon*, 2011 WL 1457236, at *5 (citing *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937) and *Utica Lloyd's of Tex. v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998)). Because the Federal DJA, rather than Texas's DJA, applies, the Hammans' request for attorneys' fees based on their declaratory judgment action depends on federal law. *See Mercantile Nat. Bank at Dall. v. Bradford Tr. Co.*, 850 F.2d 215, 216–19 (5th Cir. 1988) (holding that federal courts may only award attorneys' fees in declaratory judgment actions, which originated under state law, where federal law authorizes the award).

The Federal DJA does not independently authorize an attorneys' fee award. *Utica*, 138 F.3d at 210 (quoting *Mercantile,* 850 F.2d at 218) ("[Section] 2202 of the Federal DJA 'does not by itself provide statutory authority to award attorney's fees that would not otherwise be available under state law in a diversity action.'"). Under the Federal DJA, attorneys' fee awards are limited to situations in which (1) an exception to the American Rule exists, or (2) where "controlling substantive law permits recovery." *Id.* (quoting *Mercantile*, 850 at 216). Because the Texas DJA is not substantive law, nor does it operate as an exception to the American Rule, the Hammans cannot recover attorneys' fees based on the successful prosecution of their declaratory judgment

action.  *Self-Insurance Inst. of Am., Inc. v. Korioth*, 53 F.3d 694, 697 (5th Cir. 1995) ("The Texas

DJA is neither substantive nor controlling.").   The Hammans must look to their successful

contractual claim as a basis for recovering attorneys' fees.

Still, the Hammans' ability to recover attorneys' fees from Defendants is limited.  Section

38.001 of the Civil Practices and Remedies Code authorizes plaintiffs to recover attorneys' fees

from "an individual or organization."   CIV. PRAC. & REM. § 38.001(b).   However, prior to

September 2021, section 38.001 only provided for the recovery of attorneys' fees from "an

individual or corporation."   *See* Act of May 17, 1985, 69th Leg., R.S., ch. 595, § 1, sec. 38.001,

1985 Tex. Gen. Laws 3242, 3278–79 (amended 2021) (current version at Tex. Civ. Prac. & Rem.

Code § 38.001).   Under the former provision, the term "corporation" did not encompass limited

liability companies or limited partnerships.   *See James Constr. Grp., LLC v. Westlake Chem.*

*Corp.*, 594 S.W.3d 722, 766 (Tex. App.—Houston [14th Dist.] 2019, pet. granted) ("This court

and others have held that chapter 38 does not permit recovery of attorney's fees from a limited

liability company."); *Choice! Power, L.P. v. Feeley*, 501 S.W.3d 199, 213 (Tex. App.—Houston

[1st Dist.] 2016, no pet.) ("Section 38.001 [does] not permit recovery of attorneys' fees from any

kind of partnership.").

In enacting the new version of section 38.001, the Texas Legislature noted:

> The change in law made by this Act *applies only to an award of attorney's*
> *fees in an action commenced on or after the effective date of this Act*. An
> award of attorney's fees in an action commenced *before the effective date*
> of this Act *is governed by the law applicable to the award immediately*
> *before the effective date of this Act*, and that law is continued in effect for
> that purpose.

Act of June 15, 2021, 87th Leg., R.S., ch. 665, § 2, sec. 31.008, 2021 Tex. Sess. Law Serv. (West)

(emphasis added).  Based on this provision, the Legislature did not intend for plaintiffs like the

Hammans to reap the benefits of section 38.001's amendment.  The Hammans are bound by the

old version of section 38.001.  *See In re M.C.C.*, 187 S.W.3d 383, 384 (Tex. 2006) ("Statutes are only applied retroactively if the statutory language indicates that the Legislature intended that the statute be retroactive.").  Under the prior version of section 38.001, the Hammans cannot recover attorneys' fees from Houston Bluebonnet, a Texas limited liability company, or from E&H, a non-resident limited partnership.[23]

### B.    The Hammans' Attorneys' Fee Award

The Hammans seek $147,435.50 in attorneys' fees[24] and $8,133.54 in expenses.  The Hammans' success on their breach of contract claim entitles the Hammans to recover attorneys' fees under section 38.001.  *Ventling v. Johnson*, 466 S.W.3d 143, 154 (Tex. 2015) ("Under section 38.001, the trial court has no discretion to deny attorney's fees when presented with evidence of the same.").  To recover the requested fees, the Hammans bore the burden of establishing the fees' reasonableness and necessity.  *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 489 (Tex. 2019).

Texas courts employ the lodestar method in determining a reasonable attorneys' fee award under Texas's fee-shifting statutes.  *Id.* at 497–98.  Under the lodestar method, a presumptively reasonable award of attorneys' fees is calculated by multiplying "the reasonable hours [the attorney] worked . . . by a reasonable hourly [billing] rate."  *Id.* at 498–500.  The reasonableness of both the hours expended and the rate charged may be established by evidence of: "(1) [the] particular services performed, (2) who performed those services, (3) approximately when the

---

[23] According to the Hammans, the Suckle 1999 Living Trust succeeded to E&H's working interest, and thereby E&H's liability to the Hammans, on October 30, 2010.  (ECF No. 48 at 5, 9).  Defendants do not dispute this contention.

[24] This includes 182.1 hours billed by Lee Gill at $375 per hour; 4.4 hours billed by Jean Anderson at $120 per hour; 1.3 hours by Catey Bourdeaux at $100 per hour; 8.5 hours billed by Patty Blake at $510 per hour; and 5.5 hours by Renea Conn at $330 per hour.  (ECF No. 134 at 2–5).  A portion of these hours were written off due to the settlement of certain claims against non-Defendant working interest owners.  (*See* ECF No. 134 at 2).  Additionally, the requested fee amount includes 52.4 hours billed by Barnet Skelton at $500 per hour.  (ECF No. 134 at 9–22).

services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Id.* In *rare* circumstances, the lodestar amount may be adjusted up or down. *Id.* at 501–02 (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997)).

The Hammans presented testimony from their attorneys—Lee Gill and Barnet Skelton[25]— as support for the reasonableness and necessity of the Hammans' attorneys' fee request. (*See* ECF No. 143 at 12–46); *cf. Rohrmoos Venture*, 578 S.W.3d at 490 ("Historically, claimants have proven reasonableness and necessity of attorney's fees through an expert's testimony—often the very attorney seeking the award . . . ."). Additionally, the Hammans provided their attorneys' contemporaneous billing records, which evidence the fees and expenses incurred through March 31, 2021. (*See* ECF No. 134-1). The Hammans' evidentiary support for their attorneys' fee request went largely uncontested. However, Defendants take issue with Mr. Gill's "failure" to segregate fees among the Hammans' claims and the various Defendants. (*See* ECF No. 143 at 33:18–34:14, 37:16–38:4).

Attorneys' fee claimants have a duty to segregate those fees that are recoverable from those that are not. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). Fees may be unrecoverable if incurred pursing a defendant against whom the fees cannot be charged, pursing unsuccessful claims, or in pursuit of claims for which there is no associated right to recover attorneys' fees. *See id.* (quoting *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991)) ("[T]he plaintiff is required to show that attorney's fees were incurred while suing the defendant sought to be charged with the fees on a claim which allows recovery of such fees." (quote cleaned

---

[25] Lee Gill has been a licensed Texas attorney since 1977. Mr. Gill is currently associated with Jones Gill Porter Crawford & Crawford and specialized in oil, gas, and mineral law. In addition to Mr. Gill, other members of Mr. Gill's firm performed services related to the Hammans' case. (*See* ECF No. 134-1 at 4–5). Barnet Skelton has been a licensed Texas attorney since 1979. Mr. Skelton is a solo practitioner specializing in bankruptcy law.

up)); *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 143 (Tex. App.—El Paso 1997, pet. denied) ("[O]nly those fees attributable to the claim falling within the scope of such statute or contract are recoverable."). Yet fees need not be segregated if they are "so intertwined" that the "discrete legal services [rendered] advance both [the] recoverable and unrecoverable claim[s]." *Chapa*, 212 S.W.3d at 313–14. Moreover, a failure to properly segregate attorneys' fees will not preclude the claimant from recovering entirely. *Id.* at 314. Rather, the unsegregated amount will aid the determination of the appropriate, segregated fee award. *Id.*

Mr. Gill testified that he did not segregate his firm's fees related to the Hammans' case because the issues in the case were "inextricably intertwined." (ECF No. 143 at 33:18–34:14). To undermine this assertion, Defendants attempted to establish that Mr. Gill could have segregated fees related to the quieting of the Hammans' title to the NPI. (*See, e.g.,* ECF No. 143 at 37:16–38:4). However, as Mr. Gill made clear, his efforts were focused on recovering unpaid NPI proceeds. (ECF No. 143 at 37:20–21). To achieve the Hammans' objective, Mr. Gill first had to establish that Defendants were bound by the NPI and failed to pay the Hammans amounts due under the NPI. (ECF No. 143 at 34:10–14).

Mr. Gill's description of the steps required to secure relief for the Hammans demonstrates how the Hammans' claims were so intertwined as to fall outside the fee segregation requirement. Here, the parties' dispute centered on the NPI's enforceability. This issue pervaded the parties' pleadings, discovery, and litigation of the Hammans' claims (to this day, Defendants still attempt to litigate the NPI's enforceability). The Hammans succeeded in securing a declaratory judgment that the NPI is enforceable against Defendants. While the Hammans cannot recover attorneys' fees based on their declaratory success, the declaratory judgment was, in this case, a necessary predicate to the Hammans' breach of contract claim. That is, services related to the declaratory

judgment request necessarily advanced the Hammans' breach of contract claim. The breach of contract claim's dependence on the declaratory judgment action obviated Mr. Gill's obligation to segregate the discrete legal services associated with the declaratory judgment action from those services related to the breach of contract claim. *See Chapa*, 212 S.W.3d at 313–14 ("[I]t is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated.").

The Hammans' Natural Resources Code non-payment claim also depended largely on the Hammans' declaratory judgment. However, the Hammans did not prosecute their Natural Resources non-payment claim on summary judgment. (*See generally* ECF Nos. 48, 74). Thus, the Hammans' lawyers had an obligation to segregate discrete legal services rendered solely to advance the Natural Resources claim. *Chapa*, 212 S.W.3d at 313. There was no such segregation, nor did Mr. Gill offer testimony regarding the amount of time devoted to the Hammans' Natural Resources claim. *Cf. id.* at 314 (noting that where an attorney failed to segregate fees, "an opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary" to advance claims for which attorneys' fees were recoverable).

Undoubtedly, the Hammans' attorneys devoted at least some time solely to the Hammans' Natural Resources claim—it was pleaded in the Hammans' complaint and the Hammans sought attorneys' fees based on that claim here. These specific efforts likely did not advance the Hammans' breach of contract claim (*i.e.,* the claim on which attorneys' fees are recoverable). *Cf. id.* at 313 ("It is certainly true that [the plaintiff's] fraud, contract, and DTPA claims were all 'dependent upon the same set of facts or circumstances,' but that does not mean they all required the same research, discovery, proof, or legal expertise."). Nevertheless, the discrete legal services rendered to establish the NPI's enforceability and Defendants' non-payment of the NPI—facts on

which the Natural Resources claim, if prosecuted, would depend—supported the Hammans' breach of contract claim. Based on Mr. Gill's testimony and a review of the billing records supporting the attorneys' fee request, a 10% reduction in fees is appropriate based on the Hammans' attorneys' failure to segregate fees. *Id.* at 314 ("Unsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be.").[26]

Aside from the segregation issue, Defendants do not challenge the Hammans' attorneys' fee request. Mr. Gill's and Mr. Skelton's qualifications went unchallenged. Defendants did not assert that the fees and expenses incurred were unreasonable or unnecessary. The Hammans' evidence established what services were rendered, who performed those services, and when they were performed. (ECF No. 134-1 at 2–22; *see generally* ECF No. 143); *cf. Rohrmoos Venture*, 578 S.W.3d at 502. Mr. Gill's and Mr. Skelton's testimony regarding the reasonableness of the time expended went uncontested. (*See* ECF No. 143 at 15:15–22, 21:19–22:17, 25:11–19, 26:5–23, 40:13–22, 41:16–42:8, 43:7–11); *cf. Rohrmoos Venture*, 578 S.W.3d at 502. And Defendants did not refute the reasonableness of the hourly rates charged by Mr. Gill's firm and Mr. Skelton. (*See* ECF No. 143 at 21:19–22:17, 41:16–42:8); *cf. Rohrmoos Venture*, 578 S.W.3d at 502. Moreover, both Mr. Gill and Mr. Skelton testified that the amount of fees requested here was comparable to fee requests in other cases. (*See* ECF No. 143 at 21:19–22:17, 41:16–42:8). In fact, the reasonableness of the fees and expenses requested here is more pronounced as Defendants have continuously attempted to litigate issues this Court previously adjudicated.

---

[26] This reduction reflects that only a small portion of the Hammans' Natural Resources claim did not depend on the same legal services rendered in support of the Hammans' declaratory judgment and breach of contract claims. For instance, the Hammans' obligations under the Natural Resources Code to give notice to the "payor" of its failure to pay, as well as services related to the Hammans' assertion of a right to attorneys' fees under the Natural Resources Code. *See* NAT. RES. §§ 91.404, 91.406.

Finally, the Hammans seek $4,500 in fees incurred by Mr. Gill after March 31, 2021, as well as an "estimate[d]" $6,000 in additional fees for Mr. Skelton's services.  However, the billing records the Hammans submitted end on March 31, 2021, and do not support the additional $6,000 for Mr. Skelton's services.  (*See* ECF No. 134).  These unsupported fees were not specifically addressed at the attorneys' fees hearing.  The Hammans' evidence is insufficient to establish the reasonableness and necessity of the $4,500 in fees incurred after March 31, 2021 and Mr. Skelton's additional fees.  *Cf. El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 763 (Tex. 2012) ("Neither attorney presented time records or other documentary evidence.  Nor did they testify based on their recollection of such records. . . . Without at least some indication of the time spent on various parts of the case, a court has little basis upon which to conduct a meaningful review of the fee award.").

Excluding the unsupported requested fees, the Hammans request $136,935.50 in attorneys' fees.  After reducing the requested fees by 10% on account of the Hammans' Natural Resources Code claim, the lodestar amount is $123,241.95.  Neither the Hammans nor Defendants requested a lodestar adjustment, and the evidence presented does not warrant an adjustment.  The Hammans are entitled to recover $123,241.95 in attorneys' fees.  Based on the Hammans' uncontested evidence, they are also entitled to recover the requested $8,133.54 on account of reasonable and necessary expenses.[27]

## III.   PREJUDGMENT INTEREST

The Hammans request an award of prejudgment interest based on Texas Natural Resources Code section 91.403(a).  Texas law also authorizes prejudgment-interest awards on equitable grounds.  *Fortitude Energy, LLC v. Sooner Pipe LLC*, 564 S.W.3d 167, 188 (Tex. App.—Houston

---

[27] Defendants, except for Houston Bluebonnet and E&H, are jointly and severally liable to the Hammans for the award of attorneys' fees and expenses.  The Court expresses no opinion regarding the inter-defendant contribution obligations of Houston Bluebonnet and E&H.

[1st Dist.] 2018, no pet.) (citing *Hand & Wrist Ctr. of Houston, P.A. v. Republic Servs., Inc.*, 401 S.W.3d 712, 717 (Tex. App.—Houston [14th Dist.] 2013, no pet.)) ("Texas law provides two sources for an award of prejudgment interest: (1) general principles of equity, and (2) an enabling statute."). Because the Hammans assert Texas state law claims, Texas law controls the award of prejudgment interest. *See In re Okedokun*, 968 F.3d 378, 392 (5th Cir. 2020) (applying Texas state law to determine whether plaintiffs were entitled to prejudgment interest on their Texas state law claim).

The Hammans did not proceed on their Natural Resources non-payment claim. Hence, they are not entitled to prejudgment interest based on section 91.403. *See* NAT. RES. §§ 91.402(b), 91.403(a)–(b), 91.404(c).

Prejudgment interest is available in breach-of-contract actions. *Trevino v. City of Pearland*, 531 S.W.3d 290, 297 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing *Hand & Wrist Ctr.*, 401 S.W.3d at 717). Generally, prejudgment interest should be awarded, "absent exceptional circumstance." *Okedokun*, 968 F.3d at 392 (citing *Joy Pipe, USA, L.P. v. ISMT Ltd.*, 703 F. App'x 253, 258 (5th Cir. 2017)) (applying Texas law). Prejudgment interest is intended to make a party whole by compensating the party for the "lost use of his funds while the case is pending." *Siam v. Mountain Vista Builders*, 544 S.W.3d 504, 513 (Tex. App.—El Paso 2018, no pet.) (citing *Matthews v. DeSoto*, 721 S.W.2d 286, 287 (Tex. 1986)). To ensure the successful party is made whole, prejudgment interest begins accruing on the "earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed." *Id.* (quoting *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531 (Tex. 1998)). The rate at which prejudgment interest accrues "is calculated as simple interest and is based on the post-judgment interest rate applicable at the time of judgment." *Id.* (citing *Kenneco*, 962 S.W.2d at

532).  The Texas Finance Code provides the basis for calculating the prejudgment interest rate. *See* TEX. FIN. CODE ANN. § 304.003 (West 2021) (enumerating applicable post-judgment interest rate calculations); *ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d 303, 319 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("[P]rejudgment interest in a breach-of-contract action is properly awarded pursuant to section 304.003 of the Finance Code.").

The Hammans are entitled to prejudgment interest, as there are no "exceptional circumstances" that justify denying prejudgment interest.  Currently, the applicable prejudgment interest rate is 5.00%.  TEX. OFF. OF CONSUMER CREDIT COMM'R, 41 TEX. CREDIT LETTER no. 7 (Aug. 17, 2021), https://occc.texas.gov/sites/default/files/uploads/credit-letters/08-17-21.pdf; *see also* FIN. § 304.003(b); *In re Sunnyland Dev., Inc.*, 597 S.W.3d 529, 531 (Tex. App.—Houston [1st Dist.] 2020, no pet.) ("[E]ach month Texas's consumer credit commissioner calculates the post-judgment rate that will apply to money judgments rendered during the succeeding month under section 304.003.").  Prejudgment interest began accruing on November 25, 2013, the date the Hammans initiated this suit.  *See Siam*, 544 S.W.3d at 513.  The prejudgment interest to which the Hammans are entitled is calculated as simple interest accruing annually on the amount of unpaid NPI proceeds.  *See Foretravel, Inc. v. Star City Coach Works Ltd.*, 9:09-CV-141, 2011 WL 13196207, at *6 (E.D. Tex. Jan. 5, 2011) (citing *Kenneco Energy*, 962 S.W.2d at 531–32) ("The court may . . . award pre-judgment interest using the principles of common law, which . . . accrues at the same rate as post-judgment interest under Tex. Fin. Code §§ 304.003(c) and 304.103, and is calculated as simple interest.").

## CONCLUSION

The Hammans hold a valid 5.00% NPI that Defendants are obligated to pay out of their working interest.  Each Defendant is jointly and severely liable to the Hammans for (i) unpaid NPI proceeds; and (ii) prejudgment interest accrued on the unpaid amounts.  Each Defendant, excepting Houston Bluebonnet and E&H LP, is also jointly and severally liable to the Hammans for $123,241.95 in attorneys' fees and $8,133.54 in expenses.  A separate Judgment will be issued.

SIGNED 10/05/2021

_____
Marvin Isgur
United States Bankruptcy Judge